**LEONARD & HARRAL PACKING COMPANY d/b/a L & H Packing Company, Appellant,**

v.

**Ivan WARD d/b/a Ward Feed Yard, Appellee.**

**No. 10–93–263–CV.**

Court of Appeals of Texas, Waco.

May 27, 1998.

Rehearing Overruled July 8, 1998.

Michael Shearn, San Antonio, for appellant.

Charles Buenger, Kathleen French Dow, Buenger & Associated, Waco, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION ON REMAND

DAVIS, Justice.

On original submission, this Court affirmed the judgment against Leonard & Harral Packing Company (L & H) which awarded Ivan Ward actual damages, additional damages, interest, and attorney's fees under the Deceptive Trade Practices Act (DTPA). *See Leonard & Harral Packing Co. v. Ward*, 883 S.W.2d 337 (Tex.App.—Waco 1994), *rev'd*, 937 S.W.2d 425 (Tex.1996); TEX. BUS. & COM. CODE ANN. § 17.50(a) (Vernon Supp.1998). In its 1996 opinion, the Supreme Court remanded the case for us to conduct a *Moriel* review of the DTPA additional damages. *Leonard & Harral Packing Co. v. Ward*, 937 S.W.2d 425, 425 (Tex.1996); *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994).

In *Moriel*, the supreme court held "that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its opinion, explaining why that evidence either supports or does not support

the punitive damages award in light of the *Kraus* factors." *Moriel,* 879 S.W.2d at 31; *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). The Supreme Court has extended the *Moriel* review to an award of additional damages under the DTPA. *See Haynes & Boone v. Bowser Bouldin Ltd.,* 896 S.W.2d 179, 183 (Tex.1995).

### FACTUAL BACKGROUND

In January of 1991, L & H transported two shipments of 100 calves from Ward's feedlot in China Spring, Texas, to Crawford Meat Company in Franklinton, Louisiana. The first shipment to arrive at Crawford's contained two dead calves, and the second shipment contained three dead calves. According to Timmy Crawford, the remainder of the calves were severely bruised, and he was not able to use the meat in the intended manner. Crawford reduced the price from $1.45, which Crawford and Ward had previously negotiated, to $1.00 per pound due to the bruised nature of the calves.

Ward accepted the lower amount, notified L & H that he held it responsible, and asked to be compensated for his loss. L & H investigated the claim and sent a letter saying that it was not responsible and would not compensate Ward. Ward then filed suit alleging breach of contract, negligence, and knowing violations of the DTPA.

The jury found that L & H had failed to perform services in a good and workmanlike manner and that such failure was a producing cause of Ward's damages. The jury awarded $29,218.80 in actual damages. The jury also found that L & H knowingly engaged in the wrongful conduct and awarded Ward additional damages of $36,523.50.

### REVIEW OF THE EVIDENCE

■ The *Kraus* factors to consider in determining whether an award of exemplary damages is reasonable include "(1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety." *Kraus,* 616 S.W.2d at 910. The factors often overlap and "do not always apply to every award of punitive damages." *See Ellis County State Bank v. Keever,* 936 S.W.2d 683, 686 (Tex.App.—Dallas 1996, no writ).

### NATURE OF THE WRONG

■ "The nature of the wrong refers to the nature of injury or harm caused by the defendant's actions." *Id.* As a result of L & H's breach of the warranty of good and workmanlike performance of a service contract, Ward sustained an economic loss. Ward testified that L & H was known as a common carrier of cattle and represented that "they could handle the cattle and take care of them and that sort of thing." Further, Ward stated that he believed that L & H warranted "that they were capable of hauling calves in a workmanlike manner and knew what they were doing and would take care of [the calves] and not damage them."

According to Crawford, when the calves arrived at his meat packing company "they were just kind of beat up, run over, where they got down on the truck and the other ones had just fell down on the truck and the other ones had just fell down on top of them, they were just—basically got beat up." Five calves were dead upon arrival. Crawford testified that the calves were "stressed out" and would not stand up in the pens. Crawford testified that he had never seen a load of calves that acted this way and their behavior was an indication of a "rough ride." He testified that the calves were injured during transport, supporting a breach of the warranty of good and workmanlike performance.

When Crawford began to slaughter the calves, he discovered that the fat "wasn't normal" and was "bloodshot instead of being white." Crawford testified that he tried to salvage as much meat as he could but from "some of them we could [only] salvage a half a carcass. Some of them we could salvage hinds and fronts . . . ." Due to the bruised condition of the calves, Crawford gave Ward $1.00 per pound instead of the previously agreed upon $1.45, which resulted in a $29,-217.35 loss to Ward. Crawford's testimony provides support for the jury's finding that

Ward suffered an economic loss as a result of L & H's breach.

Mark Phillips delivered the first shipment for L & H. A portion of his testimony confirms that the calves experienced a "rough ride." He testified that he had problems keeping the calves on their feet from the very beginning of the trip and the problems continued throughout the trip to Louisiana.

Other evidence tends to show that L & H acted in a good and workmanlike manner and that Ward's loss was due to Crawford wrongly deciding to lower the price he would pay. Phillips testified that he had not made quick stops or sharp turns and had not operated the truck in a manner which would cause the calves to fall down. Although other witnesses testified the weather was bad, Phillips recalled that the weather was not bad enough to prevent the hauling of the calves.

Ward and Crawford testified that healthy cattle should "dress out on the rail" at an industry average of about 55% of their live weight. Crawford's records show that the first shipment of calves "dressed out on the rail" at 58.73% of their live weight and the second shipment at 56.85% of their live weight. L & H argued that Ward's calves weighed in above the industry standard and thus, Ward should not have agreed to a lower price.

## CHARACTER OF CONDUCT AND DEGREE OF CULPABILITY

The character of the conduct involved and the degree of the wrongdoer's culpability refer to the evidence of L & H's state of mind, the degree of conscious indifference, and any malice in its actions. *Id.* at 687. The jury found that L & H knowingly engaged in wrongful conduct.

Crawford testified that "the drivers said they had problems with [the calves]." Phillips testified that he began having problems with the load immediately and told the L & H dispatcher that the calves were lying down in the truck before he left Waco. He said that he stopped six times during the trip and each time there were calves down. He called the L & H dispatcher five times and the

dispatcher told him to continue the journey and "just try not to stop as much as you can and to hurry up with them."

According to Phillips, he wanted to leave some of the calves at a barn along the way. However, he did not mention this to the dispatcher. Instead Phillips asked the dispatcher, "what I should do? And he said keep going." Phillips testified that "if [L & H] would have wanted [him] to unload [the calves], [they] would have told [him] to unload them." Phillips's testimony supports the idea that L & H had knowledge of the difficulties Phillips experienced during the trip. L & H told Phillips to continue the trip even though the calves kept falling down. L & H acted with conscious indifference.

Ward notified L & H about the damages to the cattle and asked to be compensated for the losses he had suffered. Linda Bumpers, risk manager for L & H, conducted an investigation of Ward's claim. Bumpers sent a letter to Ward stating that the drivers, the dispatcher, and Crawford were interviewed about the shipment. Bumpers came to the conclusion that L & H was not responsible for the damage sustained to Ward's calves.

Bumpers' letter stated that the cattle were in a "weakened, deteriorated condition when they left Ward's Feedyard." However, Ward testified that he "eye-balled every one" of the calves and that they were all "fat, finished calves." Crawford also testified that the calves were "fat" and "well-rounded" and did not appear to be malnourished.

John Lewis and Jack Wall, representatives of a feed company, were present at the Ward's feedlot the day the first shipment of calves were loaded onto the truck. The two men testified that the calves appeared healthy. Tommy Long, a rancher, was present when the second shipment was loaded and testified that the calves in the shipment were healthy and fat.

Bumpers' letter stated that L & H's drivers said that the cattle were "standing in mud from knee deep to belly deep" and were so muddy that it was difficult to even tell what color they were. Lewis and Wall testified that the calves could not sink belly deep in Ward's feedlot because the feedlot is built

on a rocky hill. Wall testified that it had been raining that week and the calves had some mud on their legs and "a little bit on their belly."

Phillips testified that the calves had mud on their sides but he was able to tell what color they were. Phillips also testified that the calves were not in such a bad condition that they should not have been hauled. Crawford testified that the calves were "cakey" from the mud but the mud did not effect his ability to use the meat as intended.

Bumpers' letter also stated that the weather conditions were severe. However, Phillips testified that the weather was not bad enough to prevent the hauling of the calves. Wall testified that there was ice on the fences but not any ice on the road.

In her letter, Bumpers referred to the drivers as "seasoned professionals at cattle transporting." In reality, Phillips said he was not a "cattle expert" and had been hauling cattle for only six months. The second driver with Phillips had been hauling cattle for only two months. The drivers of the second shipment had been with L & H for only four months.

Bumpers' letter tends to show that L & H acted wrongfully in investigating the transport of the calves. Bumpers concludes that an initial "weakened and deteriorated condition" of the calves caused Ward's economic loss. However, the testimony of L & H's driver and other witnesses contradicts this conclusion.

The only evidence tending to mitigate L & H's culpability is Phillip's testimony that he stopped six times to try and get the calves on their feet. He used a cattle prod and even climbed into the truck to get the calves on their feet.

## SITUATION AND SENSIBILITIES OF THE PARTIES

■ The situation and sensibilities of the parties concerned refers to evidence of such things as remorse, remedial measures, and ability to pay punitive damages. *Id.* at 688. The letter sent to Ward is evidence that L & H accepted no blame for the damaged calves and expressed no remorse. The letter placed the blame on the "weakened and deteriorated condition" of Ward's calves and the allegation that they were covered in mud. As discussed above, testimony from L & H's driver contradicted these characterizations of the calves. No evidence in the record shows ability to pay or that L & H took any remedial measures.

Neither the driver nor the dispatcher called Ward to tell him about the problems. Ward spoke to the dispatcher during the first shipment but was not told about any problems that Phillips had reported to the dispatcher.

## PUBLIC SENSE OF JUSTICE AND PROPRIETY

The evidence outlined above shows that the calves were damaged when they arrived at Crawford's and as a result, Ward sustained an economic loss. Ward contacted L & H and asked it to compensate him for his loss. Bumpers then investigated the claim and according to her letter, interviewed the drivers, the dispatcher, and Crawford. However, the testimony of the witnesses at trial, including one of the drivers and Crawford, tends to contradict her findings. Thus, the record contains evidence that L & H's breach of good and workmanlike performance and the questionable investigation offend a public sense of justice and propriety.

## CONCLUSION

Having detailed and explained the evidence supporting the award of additional damages, and the evidence which does not support the award, we conclude that the evidence supports the jury's award of additional damages. *See Moriel,* 879 S.W.2d at 31. A rational jury could have found that the nature of the wrong, the character of the conduct, the degree of L & H's culpability, the situation and sensibilities of the parties, and the public's sense of justice and propriety required L & H to pay additional damages. *See Kraus,* 616 S.W.2d at 910.

We affirm the judgment.