Linda GRAY and the Children's
Learning Place, Inc.,
Appellants,

v.

Helen ALLEN, April Allen, and
Melissa Rodriquez,
Appellees.

No. 2–99–393–CV.

Court of Appeals of Texas,
Fort Worth.

March 15, 2001.

Rehearing Overruled April 12, 2001.

Noemi A. Collie, Dallas, Attorney for Appellant.

McMillan & Lewellen, P.C.; Garry Lewellen, Stephenville, Attorney for Appellee.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

Appellant Linda Gray[1] appeals from the trial court's remittitur of her punitive damages award. In one point, Gray argues that the trial court erred in granting the remittitur. We affirm as modified.

### FACTUAL AND PROCEDURAL BACKGROUND

Gray and CLP filed suit for defamation and tortious interference with a contract against Appellees Helen Allen, April Allen, and Melissa Rodriquez[2] alleging they were slandered by statements made by Appellees in September 1996. The claim for tortious interference with a contract was disposed of by directed verdict in favor of the three defendants. The defamation claim proceeded to trial. The jury found that Helen had not made any defamatory statements. However, the jury found that April and Melissa had each made defamatory statements and that the statements had adversely affected Gray and CLP. The jury did not award CLP any damages, but awarded Gray $6,000 in actual damages. Additionally, the jury found the statements were made with malice and awarded Gray $40,000 in punitive damages.

Appellees filed a motion for judgment notwithstanding the verdict. The court considered the motion and indicated that it found the amount of punitive damages to be "entirely out of line" and that it would either order a remittitur of $36,000 in punitive damages or grant a new trial. Gray agreed to the remittitur without waiving the right to appeal. The trial court rendered judgment in favor of Gray for $6,000 in actual damages and $4,000 in punitive damages, jointly and severally against April and Melissa.

### REMITTITUR OF PUNITIVE DAMAGES

In her sole point on appeal, Gray argues that the trial court erred in ordering a remittitur of the punitive damages award. Specifically, Gray contends that the evidence was factually sufficient to support the jury's finding that she had been defamed, that she had suffered actual damages, and that Appellees acted with malice. Furthermore, Gray contends that the punitive damages award was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellees contend that their statements were not about Gray; however, the statements implied that Gray ran a shoddy day care center and, thus were about her. Further, as we demonstrate below, the statements

---

1. Although Gray and the Children's Learning Place (CLP) filed a joint notice of appeal, only Gray filed a brief arguing error and requesting relief. Therefore, we address only Gray's point on appeal.

2. Technically, Helen is not an Appellee or a proper party to this appeal because the trial court did not render judgment against her and Gray does not raise any points on appeal involving her.

were so harmful as to support the jury's punitive damages award of $40,000.

Exemplary damages must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). Factors that should be considered in determining whether an exemplary damages award is excessive are: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.* These factors often overlap and do not always apply to every award of punitive damages. *See Leonard & Harral Packing Co. v. Ward,* 971 S.W.2d 671, 673 (Tex.App.— Waco 1998, no pet.). Furthermore, there is no set ratio between the amount of actual and exemplary damages that will be considered reasonable. *Kraus,* 616 S.W.2d at 910. This determination depends upon the facts of each particular case. *Id.* The amount to be awarded rests largely in the discretion of the jury. *Southwestern Inv. Co. v. Neeley,* 452 S.W.2d 705, 708 (Tex. 1970); *Transmission Exch. Inc. v. Long,* 821 S.W.2d 265, 272 (Tex.App.—Houston [1st Dist.] 1991, writ denied). The jury's award of exemplary damages should not be set aside on grounds of excessiveness if there is any probative evidence to support it. *Transmission Exch.,* 821 S.W.2d at 272.

After the jury awarded Gray both actual and punitive damages, the trial court sua sponte ordered a remittitur of $36,000 of the $40,000 exemplary damages award, stating that the award was "entirely out of line." We review a trial court's order of remittitur under a factual sufficiency standard. *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 847 (Tex.1990); *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.

1987). We will uphold a trial court's remittitur only when the evidence is factually insufficient to support the verdict. *Larson,* 730 S.W.2d at 641. The evidence is factually insufficient if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). We are required to consider all of the evidence in the case in making this determination. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

In factual insufficiency cases, our opinion must detail the evidence relevant to the point in consideration and clearly state why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g). Further, our opinion must state in what regard the contrary evidence greatly outweighs the evidence in support of the finding. *Id.; see also Lofton v. Tex. Brine Corp.,* 720 S.W.2d 804, 805 (Tex. 1986).

### THE TESTIMONY

At trial, Gray testified that Melissa went to CLP and began "name calling" saying things such as "whore" and "prostitute." Gray asked Melissa if she could help her, and Melissa replied that one of Gray's employees was a prostitute and had a criminal history. Gray repeatedly asked Melissa to leave. Melissa stated that she was going to tell the parents of the children in the day care center that Gray hired prostitutes to work at CLP. Another CLP employee called 911 for assistance, and Gray told the police that she needed

an officer to go to the day care center immediately. Melissa then voluntarily left CLP.

Tracy Quirl testified that she was approached by April at their work place, and April asked if her child was still enrolled at CLP. Quirl testified that April told her that someone employed by CLP had been involved in activities that would make her unsuitable to be employed there. Quirl stated that April told her that the activities involved prostitution and drugs, that the employee had stolen from her pimp, that there was an issue about molestation, and that the employee had a police record that would substantiate the allegations. Quirl testified that she was shocked and concerned by the information; therefore, she called Gray and questioned her about the allegations.

JoRita Allison, Gray's daughter and an employee at CLP during the time in question, testified that she was present when Melissa entered the day care center and, in front of the children and day care center staff, said that Gray had hired a prostitute. Allison also testified that the statements made by Melissa caused Gray emotional distress for several weeks following the event.

During her testimony, Melissa admitted to having gone to CLP and having made the statements about Shana Riale. Melissa denied telling Gray that she was going to tell others that Gray had hired a whore or prostitute to work at the day care center. In her defense, Melissa asserted that Riale herself had admitted that she was a whore and a prostitute. When asked to whom Riale had made these statements, Melissa did not substantiate her claim by listing any names and instead stated that she would need some time to get the names together. Melissa then acknowledged her motivation for making these statements.

Melissa testified that she had been going out with Riale's estranged husband during his separation. She testified that during the time she was dating Riale's husband, she was "stupid enough to hand him the money" for a divorce, but he decided to go back to Riale anyway. Melissa said that her feelings were hurt when Riale's husband left her. Melissa also admitted that she was "stupid enough just to walk into the day care and put [herself] in that kind of situation and get [herself] in trouble." Melissa acknowledged receiving the letter from Gray's attorney accusing her of making defamatory statements and demanding that she cease making the statements. When asked if she had contacted Gray to apologize for the statements, Melissa responded, "Well, of course not. I just figured I would just ignore it and go on."

April testified that she told Quirl that Gray had employed an individual at CLP who had a criminal record, was a prostitute, had stolen from her pimp, and had something to do with drugs and child molestation. April admitted that she did not know if the allegations were true and claimed that she got the information from Melissa's sister. April testified that she made the statements to several people because she would not want her child to be at a day care center where a person with that type of criminal history worked. In addition, April testified that she received a letter from Gray's attorney stating that Gray had suffered damages from the defamatory statements and that any damages incurred due to April's failure to cease making such defamatory statements would be added to the damages that Gray had already incurred. April conceded that the statements she made could cause injury to the reputation of a day care center and its director. Finally, April stated that she never attempted to contact Gray about her concerns or to apologize.

Gray testified that she believed Appellees' statements affected the reputation of the day care center and her reputation as its director. Gray testified that she was the director of the day care center and that Appellees' statements affected her ability to perform her job functions, affected her emotionally because she tried very hard to stop the rumors, and affected her financially. Gray testified that when people "hear or even think that you've got someone working in your facility that has a criminal history, has child molestation in their background, is a prostitute, has a pimp, all the stories that were being told at that time" it hurts the day care center and its management. Gray also testified that after she was contacted by two parents about Appellees' statements, she tried to defuse the situation by talking to some of the parents about the allegations.

Gray testified that she suffered a loss of income because there was a decline in new enrollments for several months after the incident at the day care center. Furthermore, Gray testified that this decline was not normal because summer vacation ended around the time the day care center experienced the decline and more children go to a day care center because their parents have to go back to work. Gray testified that she believed she incurred $6,315.50 in lost profits after the incident. Gray also demonstrated how she determined the amount of the lost profits.

In addition, Gray testified that Appellees' statements affected her in her capacity as director of the day care center because the statements made her appear to be inefficient, a bad person, and the statements made it look like she hired the wrong type of individuals to work at the day care center. Gray testified that she believed this left an impression with parents that "I'm not reputable; that I don't know how to hire good employees; that I don't check their references; [and] that I hire prostitutes and child molesters." Gray testified that she had spent practically her whole life working in the day care industry and in making sure that she had a good reputation in the industry. Gray stated that these defamatory statements would impact her ability to open another day care center for fear that something like this would happen again. Gray also testified that these statements injured her emotionally because she began having panic attacks.

Having reviewed all of the evidence, we cannot say that the jury's award of punitive damages was so against the great weight and preponderance of the evidence as to be manifestly unjust. A rational jury could have found that the nature of the wrong, the character of the conduct, the degree of April's and Melissa's culpability, the situation and sensibilities of the parties, and the public's sense of justice and propriety required April and Melissa to pay exemplary damages. Therefore, there was factually sufficient evidence to support the jury's award for $40,000 in punitive damages. *See Kraus,* 616 S.W.2d at 910. We hold that the trial court erred in ordering a remittitur of Gray's punitive damages award. We sustain point one.

### CONCLUSION

Having sustained Gray's sole point on appeal, we modify the trial court's judgment to reinstate the jury's $40,000 punitive damages award against April and Melissa and affirm the judgment as modified.