Leonard & Harral Packing Company d/b/a L & H Packing Company v. Ivan Ward d/b/a Ward Feed Yard















IN THE
TENTH COURT OF APPEALS
 

No. 10-93-263-CV

     LEONARD & HARRAL PACKING
     COMPANY D/B/A L & H PACKING
     COMPANY,
                                                                              Appellant
     v.

     IVAN WARD D/B/A WARD FEED YARD,
                                                                              Appellee
 

From the 170th District Court
McLennan County, Texas
Trial Court # 91-1840-4
                                                                                                                

OPINION ON REMAND
                                                                                                                

     On original submission, this Court affirmed the judgment against Leonard & Harral Packing
Company (L & H) which awarded Ivan Ward actual damages, additional damages, interest, and
attorney’s fees under the Deceptive Trade Practices Act (DTPA). See Leonard & Harral Packing
Co. v. Ward, 883 S.W.2d 337 (Tex. App.—Waco 1994), rev’d, 937 S.W.2d 425 (Tex. 1996);
Tex. Bus. & Com. Code Ann. § 17.50(a) (Vernon Supp. 1998). In its 1996 opinion, the
Supreme Court remanded the case for us to conduct a Moriel review of the DTPA additional
damages. Leonard & Harral Packing Co. v. Ward, 937 S.W.2d 425, 425 (Tex. 1996); See
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994).
      In Moriel, the supreme court held “that the court of appeals, when conducting a factual
sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its
opinion, explaining why that evidence either supports or does not support the punitive damages
award in light of the Kraus factors.” Moriel, 879 S.W.2d at 31; Alamo Nat’l Bank v. Kraus, 616
S.W.2d 908, 910 (Tex. 1981). The Supreme Court has extended the Moriel review to an award
of additional damages under the DTPA. See Haynes & Boone v. Bowser Bouldin Ltd., 896
S.W.2d 179, 183 (Tex. 1995).
FACTUAL BACKGROUND
      In January of 1991, L & H transported two shipments of 100 calves from Ward’s feedlot in
China Spring, Texas, to Crawford Meat Company in Franklinton, Louisiana. The first shipment
to arrive at Crawford’s contained two dead calves, and the second shipment contained three dead
calves. According to Timmy Crawford, the remainder of the calves were severely bruised, and
he was not able to use the meat in the intended manner. Crawford reduced the price from $1.45,
which Crawford and Ward had previously negotiated, to $1.00 per pound due to the bruised nature
of the calves.
      Ward accepted the lower amount, notified L & H that he held it responsible, and asked to be
compensated for his loss. L & H investigated the claim and sent a letter saying that it was not
responsible and would not compensate Ward. Ward then filed suit alleging breach of contract,
negligence, and knowing violations of the DTPA.
      The jury found that L & H had failed to perform services in a good and workmanlike manner
and that such failure was a producing cause of Ward’s damages. The jury awarded $29,218.80
in actual damages. The jury also found that L & H knowingly engaged in the wrongful conduct
and awarded Ward additional damages of $36,523.50 
REVIEW OF THE EVIDENCE
      The Kraus factors to consider in determining whether an award of exemplary damages is
reasonable include “(1) the nature of the wrong; (2) the character of the conduct involved; (3) the
degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned;
and (5) the extent to which such conduct offends a public sense of justice and propriety.” Kraus,
616 S.W.2d at 910. The factors often overlap and “do not always apply to every award of
punitive damages.” See Ellis County State Bank v. Keever, 936 S.W.2d 683, 686 (Tex.
App.—Dallas 1996, no writ).  
NATURE OF THE WRONG
      “The nature of the wrong refers to the nature of injury or harm caused by the defendant’s
actions.” Id. As a result of L & H’s breach of the warranty of good and workmanlike
performance of a service contract, Ward sustained an economic loss. Ward testified that L & H
was known as a common carrier of cattle and represented that “they could handle the cattle and
take care of them and that sort of thing.” Further, Ward stated that he believed that L & H
warranted “that they were capable of hauling calves in a workmanlike manner and knew what they
were doing and would take care of [the calves] and not damage them.”
      According to Crawford, when the calves arrived at his meat packing company “they were just
kind of beat up, run over, where they got down on the truck and the other ones had just fell down
on the truck and the other ones had just fell down on top of them, they were just--basically got
beat up.” Five calves were dead upon arrival. Crawford testified that the calves were “stressed
out” and would not stand up in the pens. Crawford testified that he had never seen a load of
calves that acted this way and their behavior was an indication of a “rough ride.” He testified that
the calves were injured during transport, supporting a breach of the warranty of good and
workmanlike performance. 
      When Crawford began to slaughter the calves, he discovered that the fat “wasn’t normal” and
was “bloodshot instead of being white.” Crawford testified that he tried to salvage as much meat
as he could but from “some of them we could [only] salvage a half a carcass. Some of them we
could salvage hinds and fronts. . . .” Due to the bruised condition of the calves, Crawford gave
Ward $1.00 per pound instead of the previously agreed upon $1.45, which resulted in a
$29,217.35 loss to Ward. Crawford’s testimony provides support for the jury’s finding that Ward
suffered an economic loss as a result of L & H’s breach. 
      Mark Phillips delivered the first shipment for L & H. A portion of his testimony confirms
that the calves experienced a “rough ride.” He testified that he had problems keeping the calves
on their feet from the very beginning of the trip and the problems continued throughout the trip
to Louisiana. 
      Other evidence tends to show that L & H acted in a good and workmanlike manner and that
Ward’s loss was due to Crawford wrongly deciding to lower the price he would pay. Phillips
testified that he had not made quick stops or sharp turns and had not operated the truck in a
manner which would cause the calves to fall down. Although other witnesses testified the weather
was bad, Phillips recalled that the weather was not bad enough to prevent the hauling of the
calves. 
      Ward and Crawford testified that healthy cattle should “dress out on the rail” at an industry
average of about 55% of their live weight. Crawford’s records show that the first shipment of
calves “dressed out on the rail” at 58.73% of their live weight and the second shipment at 56.85% 
of their live weight. L & H argued that Ward’s calves weighed in above the industry standard and
thus, Ward should not have agreed to a lower price. 
CHARACTER OF CONDUCT AND DEGREE OF CULPABILITY
      The character of the conduct involved and the degree of the wrongdoer’s culpability refer to
the evidence of L & H’s state of mind, the degree of conscious indifference, and any malice in its
actions. Id. at 687. The jury found that L & H knowingly engaged in wrongful conduct. 
      Crawford testified that “the drivers said they had problems with [the calves].” Phillips
testified that he began having problems with the load immediately and told the L & H dispatcher
that the calves were lying down in the truck before he left Waco. He said that he stopped six times
during the trip and each time there were calves down. He called the L & H dispatcher five times
and the dispatcher told him to continue the journey and “just try not to stop as much as you can
and to hurry up with them.” 
      According to Phillips, he wanted to leave some of the calves at a barn along the way. 
However, he did not mention this to the dispatcher. Instead Phillips asked the dispatcher, “what
I should do? And he said keep going.” Phillips testified that “if [L & H] would have wanted
[him] to unload [the calves], [they] would have told [him] to unload them.” Phillips’s testimony
supports the idea that L & H had knowledge of the difficulties Phillips experienced during the
trip. L & H told Phillips to continue the trip even though the calves kept falling down. L & H
acted with conscious indifference. 
      Ward notified L & H about the damages to the cattle and asked to be compensated for the
losses he had suffered. Linda Bumpers, risk manager for L & H, conducted an investigation of
Ward’s claim. Bumpers sent a letter to Ward stating that the drivers, the dispatcher, and
Crawford were interviewed about the shipment. Bumpers came to the conclusion that L & H was
not responsible for the damage sustained to Ward’s calves. 
      Bumpers’ letter stated that the cattle were in a “weakened, deteriorated condition when they
left Ward’s Feedyard.” However, Ward testified that he “eye-balled every one” of the calves and
that they were all “fat, finished calves.” Crawford also testified that the calves were “fat” and
“well-rounded” and did not appear to be malnourished. 
      John Lewis and Jack Wall, representatives of a feed company, were present at the Ward’s
feedlot the day the first shipment of calves were loaded onto the truck. The two men testified that
the calves appeared healthy. Tommy Long, a rancher, was present when the second shipment was
loaded and testified that the calves in the shipment were healthy and fat. 
      Bumpers’ letter stated that L & H’s drivers said that the cattle were “standing in mud from
knee deep to belly deep” and were so muddy that it was difficult to even tell what color they were.
Lewis and Wall testified that the calves could not sink belly deep in Ward’s feedlot because the
feedlot is built on a rocky hill. Wall testified that it had been raining that week and the calves had
some mud on their legs and “a little bit on their belly.” 
      Phillips testified that the calves had mud on their sides but he was able to tell what color they
were. Phillips also testified that the calves were not in such a bad condition that they should not
have been hauled. Crawford testified that the calves were “cakey” from the mud but the mud did
not effect his ability to use the meat as intended. 
       Bumpers’ letter also stated that the weather conditions were severe. However, Phillips
testified that the weather was not bad enough to prevent the hauling of the calves. Wall testified
that there was ice on the fences but not any ice on the road.
      In her letter, Bumpers referred to the drivers as “seasoned professionals at cattle
transporting.” In reality, Phillips said he was not a “cattle expert” and had been hauling cattle for
only six months. The second driver with Phillips had been hauling cattle for only two months. 
The drivers of the second shipment had been with L & H for only four months. 
      Bumpers’ letter tends to show that L & H acted wrongfully in investigating the transport of
the calves. Bumpers concludes that an initial “weakened and deteriorated condition” of the calves
caused Ward’s economic loss. However, the testimony of L & H’s driver and other witnesses
contradicts this conclusion. 
      The only evidence tending to mitigate L & H’s culpability is Phillip’s testimony that he
stopped six times to try and get the calves on their feet. He used a cattle prod and even climbed
into the truck to get the calves on their feet. 
SITUATION AND SENSIBILITIES OF THE PARTIES
      The situation and sensibilities of the parties concerned refers to evidence of such things as
remorse, remedial measures, and ability to pay punitive damages. Id. at 688. The letter sent to
Ward is evidence that L & H accepted no blame for the damaged calves and expressed no remorse. 
The letter placed the blame on the “weakened and deteriorated condition” of Ward’s calves and
the allegation that they were covered in mud. As discussed above, testimony from L & H’s driver
contradicted these characterizations of the calves. No evidence in the record shows ability to pay
or that L & H took any remedial measures. 
      Neither the driver nor the dispatcher called Ward to tell him about the problems. Ward spoke
to the dispatcher during the first shipment but was not told about any problems that Phillips had
reported to the dispatcher.
PUBLIC SENSE OF JUSTICE AND PROPRIETY
      The evidence outlined above shows that the calves were damaged when they arrived at
Crawford’s and as a result, Ward sustained an economic loss. Ward contacted L & H and asked
it to compensate him for his loss. Bumpers then investigated the claim and according to her letter,
interviewed the drivers, the dispatcher, and Crawford. However, the testimony of the witnesses
at trial, including one of the drivers and Crawford, tends to contradict her findings. Thus, the
record contains evidence that L & H’s breach of good and workmanlike performance and the
questionable investigation offend a public sense of justice and propriety. 
CONCLUSION
      Having detailed and explained the evidence supporting the award of additional damages, and
the evidence which does not support the award, we conclude that the evidence supports the jury’s
award of additional damages. See Moriel, 879 S.W.2d at 31. A rational jury could have found
that the nature of the wrong, the character of the conduct, the degree of L & H’s culpability, the
situation and sensibilities of the parties, and the public’s sense of justice and propriety required
L & H to pay additional damages. See Kraus, 616 S.W.2d at 910. 
      We affirm the judgment. 
REX D. DAVIS
Chief Justice
Before Chief Justice Davis
       Justice Cummings and
       Justice Vance
Affirmed
Opinion delivered and filed May 27, 1998 
Publish