NO. 07-02-0366-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

DECEMBER 9, 2003

_____

RONALD J. HETTLER, ROBIN HETTLER AND CORNWALL PERSONAL

INSURANCE AGENCY, INC. F/D/B/A HETTLER-BRENHOLTZ INSURANCE,

APPELLANTS

V.

WILLIAM DAVID BRENHOLTZ, APPELLEE

_____

FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 97-558,843; HONORABLE BRADLEY S. UNDERWOOD, JUDGE

_____

Before JOHNSON, C.J., and REAVIS and CAMPBELL, JJ.

**MEMORANDUM OPINION**

Presenting eight points of error, Ronald J. Hettler, Robin Hettler, and Cornwall

Personal Insurance Agency, Inc. f/d/b/a Hettler-Brenholtz Insurance (the Agency)

challenge the judgment following a jury trial that William David Brenholtz recover damages for, among other claims, breach of contract, fraud, conversion, and interference with business relationships. By points one through seven, they allege the trial court erred in (1) denying their no-evidence motion for summary judgment; (2) soliciting and considering oral testimony to determine the validity of the contract; (3) ruling that a document constituted an enforceable contract between Brenholtz, Ronald, and the Agency as a matter of law; (4) awarding damages for Ronald's breach of contract as insufficient evidence existed to justify the award; (5) submitting an issue of fraud to the jury as to Ronald in tort; (6) submitting liability issues in tort as to Robin as there was no evidence she committed those torts; and (7) submitting the instruction as to exemplary damages as it fails to instruct the jury what conduct could be considered to assess punitive damages. By their eighth point, they contend the punitive damages award was excessive. Based upon the rationale expressed herein, we affirm.

Ronald and Brenholtz, licensed insurance agents, both worked for Cornwall Stevens Southwest, Inc. When Ronald resigned from Cornwall in 1992, he purchased part of Cornwall's book of business and started his own insurance agency. Also, in 1992, Brenholtz resigned from Cornwall and purchased another part of the Cornwall book of business. After their resignations and while operating independently, on occasion they visited socially. Then, in 1994, the Agency, then owned and managed by Ronald, hired Brenholtz and he brought his book of business to the firm. Ronald was President of the

2

corporation and Brenholtz was Vice President. They entered into an oral agreement at that time, and on November 20, 1996, it was reduced to writing when they signed an informal memorandum drafted by Brenholtz. Although Ronald claimed the memorandum did not accurately reflect the original agreement in 1994, and was partially incomplete, nevertheless, he signed it. Robin did accounting for the Agency out of her home, and in 1996, she became licensed as an insurance agent at Ronald's request because the Agency was losing money. She commenced working in the office as an agent and accountant in January 1997; however, she was not an officer of the corporation nor a shareholder.

Before the parties submitted the November 20 memorandum to counsel for formal preparation, on February 13, 1997, Ronald sent Brenholtz a two-page handwritten letter on Hettler-Brenholtz Insurance letterhead. The letter, which contained his final paycheck, notified Brenholtz he was being terminated as of February 14 and transmitted an offer in the form of a buy-sell agreement. Among other things, Brenholtz was informed as follows:

- he was no longer an employee;
- the staff had been instructed to deny him entry into the agency;
- the locks had been changed; and
- the police would be called if he showed up.

Then, on February 17, 1997, employees of the Agency commenced sending letters to customers informing them that Brenholtz was no longer with the Agency and that "Ron Hettler will now be servicing your insurance needs."

Based on the letter of termination, Brenholtz commenced the underlying action against Ronald, Robin, and the Agency by seeking a temporary restraining order. He also sought damages for breach of contract, fraud, conversion, interference with business relationships, and an accounting. Following hearings on numerous matters, the trial commenced on February 19, 2002. Based on the jury's findings, the trial court signed its judgment that Brenholtz recover:

- $232,601 against Ronald and the Agency, jointly and severally;
- $10,000 against Ronald, Robin, and the Agency, jointly and severally;
- $200,000 against Ronald for exemplary damages;
- $200,000 against Robin for exemplary damages;
- $200,000 against the Agency for exemplary damages;

plus attorney's fees and interest.

By their first point, Ronald, Robin, and the Agency contend the trial court erred in denying their no-evidence motion for summary judgment. We disagree. As a general rule the denial of a summary judgment is not reviewable on appeal because it is not a final

4

judgment.  Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex. 1996).  *See also* comment to Rule 166a(i) Tex. R. Civ. P. (the denial of a motion under paragraph (i) is no more reviewable by appeal or mandamus than the denial of a motion under paragraph (c)). Point of error one is overruled.

By point of error two, Ronald contends the trial court erred in considering oral testimony when it granted Brenholtz's motion for partial summary judgment as to the validity of the contract, and by his third point,[1] contends the trial court erred in ruling that a document introduced into evidence constituted an enforceable contract.  We disagree. The challenged document was admitted into evidence as Plaintiff's Exhibit 7, which can best be described as a ten paragraph informal printed memorandum with handwritten notations, about one-half page in length, dated November 20, 1996, and signed by Ronald and Brenholtz.[2]

When the question was first presented by motion for partial summary judgment, the trial court was of the opinion that an agreement did not exist and denied the motion.

---

[1]We will consider points 2 and 3 together.

[2]In summary, the document provided
> Stated partnership agreement between parties, as discussed and agreed to before 6/1/94.
> Ron "brings" certain assets, furniture, etc.
> David brings his current business assets including markets, furniture, customers, etc.
> Each to retain ownership of assets and new customers.
> Ron retains 100% of stock subject to his purchase agreement.
> Ron is president and David is vice president.  No other corporate officers.
> Agency to purchase key man insurance on Ron and David.
> Profits to be shared proportionately based upon personal production.
> Each to have expense accounts for normal business and car allowance.

However, after hearing testimony during trial, the court announced it had changed its decision and concluded that an agreement existed as a matter of law. Among other instructions, as related to the contract issue, the jury was instructed as follows:

> You are instructed that the court has found an agreement existed between David Brenholtz and Ron Hettler.[3]

> You must decide the meaning of the agreement by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

Question No. 1 followed the instructions:

Question No. 1

Did Ron Hettler fail to comply with the agreement?

Answer "yes" or "no."

Answer: <u>Yes</u>

By his pleadings, Ronald alleged the 1994 oral agreement was a contract of employment by the Agency and by verified denial, expressly denied a partnership arrangement. On appeal Ronald argues in part:

> Brenholtz clearly is attempting to modify the original agreement made in June 1994. There never was a partnership.

---

[3]The instruction made no reference to Robin or the Agency.

6

Here, Ronald renews his admission that an agreement was made, but disputes it created a partnership. The trial court has considerable discretion to determine necessary and proper jury instructions. *See* Texas Workers' Comp. Ins. v. Mandlbauer, 34 S.W.3d 909, 911 (Tex. 2000). Moreover, by his points of error, Ronald does not assert charge error, and as submitted, Question No. 1 was substantially similar to a question proposed by Ronald's trial counsel.

The intention of the parties to an agreement is normally a question of fact. *See* Scott v. Ingle Bros. Pacific, Inc., 489 S.W.2d 554, 555 (Tex. 1972). Also, in Ishin Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 348 (Tex.App.--Fort Worth 1996, no writ), the court held:

> However, even if an offer and acceptance are not recorded on paper, dealings between parties may result in an implied contract where the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement. Accordingly, the parties' conduct may convey an objective assent to the terms of an agreement, and whether their conduct evidences their agreement is a question to be resolved by the finder of fact.

[Citations omitted]. However, whether an agreement is legally enforceable is a question of law. Ronin v. Lerner, 7 S.W.3d 883, 886 (Tex.App.--Houston [1st Dist.] 1999, no pet.).

The trial court did not instruct the jury that Plaintiff's Exhibit 7 contained the terms of the agreement of the parties. Instead, the jury was only charged that an agreement was made and was instructed to determine the intent of the parties. Indeed, Question No. 1

7

is a classic example of broad-form submission as authorized by Rule 277 of the Texas Rules of Civil Procedure and is not challenged on appeal. Accordingly, considering that Ronald did not plead the affirmative defense of statute of frauds applied to Plaintiff's Exhibit 7, that Ronald, although contending a partnership did not exist, admitted an agreement was made, that the trial court did not rule that Plaintiff's Exhibit 7 contained the agreement of the parties, but submitted the question to the jury, issues two and three are overruled.

By point of error four, Ronald contends the trial court erred in awarding damages for his breach of contract as insufficient evidence existed to justify the award. Ronald's challenge is based on his contention that the testimony and report of the certified public accountant called by Brenholtz was insufficient to establish damages. Among other claims, Ronald argues the accountant's calculations were based on improper methodology and that the written report introduced at trial was not an audit report and was, in part, based on hearsay. We disagree.

A party cannot raise an objection to evidence for the first time on appeal. Tex. R. App. P. 33.1(a); *see also* Prati v. New Prime, Inc., 949 S.W.2d 552, 554 (Tex.App.--Amarillo 1997, pet. denied). Also, a claim that an expert's testimony or report is unreliable must be presented by objection to the evidence before or when offered at trial. *See* Guadalupe-Blanco River Authority v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002). Moreover, under Rule 703 of the Texas Rules of Evidence, an expert opinion may be based in part

8

on facts or data "perceived by, reviewed by, or made known to the expert" provided they are the type reasonably relied on by experts in the field. *See* Sosa By and Through Grant v. Koshy, 961 S.W.2d 420, 424 (Tex.App.--Houston [1st Dist.] 1997, pet. denied). Because Ronald did not object to the testimony or evidence as required, point of error four presents nothing for review and is overruled.

By point of error five, Ronald contends the trial court erred in submitting the fraud question to the jury. We disagree. The trial court instructed the jury that fraud occurs when (a) a party makes a material misrepresentation, (b) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, (c) the misrepresentation is made with the intention that it should be acted on by the other party, and (d) the other party acts in reliance on the misrepresentation and thereby suffers injury. Ronald argues the evidence was insufficient to support a finding of the element of reliance. He focuses his argument on the testimony of a former co-worker that he intended to obtain Brenholtz's customers by the new business association and that the co-worker warned Brenholtz of her concerns. Ronald then argues that because there was no evidence of reliance, there could be no fraud as a matter of law. He also argues there was insufficient evidence to show fraud because Brenholtz admitted he received his book of business after termination; however, Brenholtz's fraud claim was not based on the report of the former co-worker.

9

Brenholtz's allegation of fraud was grounded on Ronald's representation that (1) profits would be allocated based on a full and fair accounting and (2) all Brenholtz's customers existing at the time of the commencement of business and new customers developed by Brenholtz would "remain Brenholtz's customers," however, Ronald does not address the grounds of Brenholtz's fraud claim. The informal memorandum signed by the parties addressed the question of customer accounts and rights thereto. It also provided for division of profits proportionately based upon the personal production "as a percentage of the whole each year" and for expenses accounts, car allowances, and reimbursements. Moreover, except for the reference to a "partnership," Ronald's testimony confirmed that the terms of the agreement described in the memorandum substantially comported with the terms of the 1994 oral agreement. Because Brenholtz's claim of fraud arose from the provisions expressed or necessarily arising from the memorandum signed by the parties and not the testimony of the co-worker, Ronald's fifth point is overruled.

By point six, Robin contends the trial court erred in submitting liability issues in tort as to her because there is no evidence she committed those torts.[4] We disagree. In his response, Brenholtz contends Robin's contention is not preserved for appellate review.

Objections to jury questions must be made before submission of the charge to the jury and as we held in Hart v. Moore, 952 S.W.2d 90, 96 (Tex.App.--Amarillo 1997, pet.

---

[4]Ronald and the Agency do not join in this point of error.

10

denied), objections "must be sufficiently specific to afford the trial court an opportunity to correct errors." In determining whether reversible error exists, in Bell v. Missouri-Kansas-Texas Railroad Co. of Texas, 334 S.W.2d 513, 516 (Tex.Civ.App.-- Fort Worth 1960, writ ref'd n.r.e), the court held:

> [a] part of the tests to be applied involves the determination of whether the complainant so sufficiently stated the same contention and reason therefor in his objection to the trial court as to make it apparent that the trial court, though fully cognizant of the ground of complaint, nevertheless chose to submit the issue.

In Haley v. GPM Gas Corp., 80 S.W.3d 114, 119 (Tex.App.--Amarillo 2002, no pet.), we held:

> Rule 274 of the Texas Rules of Civil Procedure requires that objections to the charge must point out distinctly the objectionable matter and the grounds of the objection, otherwise the objection is waived.

Further, Rule 33.1(a) of the Texas Rules of Appellate Procedure requires that in order to preserve a complaint for our review, a party must distinctly specify an objection to the trial court so the trial court and the other party will be advised of the objection. Thus, before we consider the point of error, we must first determine whether Robin preserved her complaint that there is no evidence she committed "those torts."[5]

---

[5]Because Ronald and the Agency do not challenge the tort findings, we need not consider whether they preserved any objections.

11

Brenholtz's breach of contract and fraud claims against Ronald only were submitted by Questions 1, 2, 5, and 6. Brenholtz's claims against Ronald, Robin, and the Agency for conversion and intentional interference with Brenholtz's existing customers and prospective business relations with his customers were submitted by Questions 3, 4, 7, 8, 9, and 10. At the charge conference, trial counsel for Ronald, Robin, and the Agency commenced his objections by addressing the contract claim which involved Ronald only. Moving on to other questions, without naming Robin, he made broad form objections. For example, regarding the conversion claim, he argued "Brenholtz received each and every bit of his property. No matter what time it happened, he did have it all; and therefore, you can't convert something that the other person already has." Then, as to the two interference with business relationship issues, without designating Robin or any other party, he argued the evidence simply pointed out that Brenholtz had all his "business relationships" or that "all conduct against the defendants having occurred in the past, their past conduct being–not being substantial enough or in existence to support future business relationships."

Robin does not argue that the question of her tortious conduct should have been submitted by separate questions. Although the actions of Ronald and Robin were not entirely common, the objections were not tailored to address the grounds of the individual parties, resulting in some confusion and uncertainty. Further, the broad presentation did not inform the court that notwithstanding the general nature of the objections, they were

12

being presented on behalf of Robin in her individual capacity. Considering that the charge conference followed an eight day trial with over 100 documents admitted into evidence, that multiple defendants were represented by the same attorney, that breach of contract and four distinct tort claims were presented with not entirely common grounds among the parties, and the presentation of objections, we conclude the objections were so "general as to be almost meaningless." *See* Ron Craft Chevrolet, Inc. v. Davis, 836 S.W.2d 672, 675 (Tex.App.--El Paso 1992, writ denied). They were also inadequate to demonstrate that the trial court was "fully cognizant of the ground of the complaint" and as such do not distinctly specify the objections to the trial court. *Bell*, 334 S.W.2d at 516. Moreover, Robin does not contend the trial court abused its discretion in submitting the tort questions. Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). Point of error six is overruled.

By point seven, Ronald, Robin, and the Agency contend the trial court erred in submitting the jury instruction on punitive damages in Questions 13 and 14 as it failed to instruct the jury what conduct could be considered in assessing punitive damages.[6] We disagree. By his response Brenholtz contends the point was not preserved for review. Thus, before we commence our analysis, we first review the objection at trial to determine whether Ronald, Robin, and the Agency objected to Questions 13 and 14 because an

---

[6]This point overlooks that jury question 14 properly listed the 6 factors for the jury to consider per § 41.011(a).

13

accompanying instruction "instructing the jury what conduct that could be considered to assess punitive damages" was not given.

In addition to the authorities mentioned in our analysis of point six necessary to preserve charge error for appellate review, the objection on appeal must comport with the objection in the trial court. *See Haley*, 80 S.W.3d at 120. Charge error is not presented on appeal because the instruction "fail[ed] to instruct the jury what conduct that could be considered to assess punitive damages." Although our review of the record as referenced shows a "no evidence challenge" was stated as to Question 13, and a no evidence challenge as to evidence of "net worth" was also presented as to Question 14, trial counsel did not object to the absence of an instruction as to what conduct could be considered to assess punitive damages. Accordingly, because the error claimed on appeal does not comport with that presented in the trial court, alleged error, if any, was not preserved for review. Point of error seven is overruled.

Ronald, Robin, and the Agency do not contend that the evidence was insufficient to support the jury finding by clear and convincing evidence that the harm to Brenholtz resulted from malice but by their point of error eight, contend only that the punitive damages awarded were excessive. We disagree.

Given the procedural posture, we need not address the award of exemplary damages but focus our review on the amount of the award. By argument in their brief and

14

reply brief, the Hettlers and the Agency rely on Southwestern Investment Company v. Neely, 452 S.W.2d 705 (Tex. 1970), and Apache Corp. v. Moore, 960 S.W.2d 746 (Tex.App.–Amarillo 1997, writ denied), and request that this Court make a suggestion of remittitur. Even though they do not contend the jury abused its discretion or address the law and factors contained in Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001-41.013 (Vernon 1997 & Supp. 2004), which is the controlling law, to the extent applicable we will consider the point.

Causes of action involving exemplary damages that accrued after September 1, 1995, are now governed by statute. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001 - 41.013 (Vernon 1997 & Supp. 2004).[7] Subject to the limitations in section 41.008 of the Code, the Legislature has directed that the amount of exemplary damages to be awarded is within the discretion of the jury. *See* § 41.010(b). The award should not be set aside as excessive unless the amount is so large as to indicate that it is the result of passion, prejudice, or corruption, or that the evidence has been disregarded. Ethicon, Inc. v. Martinez, 835 S.W.2d 826, 835 (Tex.App.–Austin 1992, writ denied). When reviewing an award of exemplary damages, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel that a different result is more reasonable. Ellis County State Bank v. Keever, 936 S.W.2d 683, 685 (Tex.App.–Dallas 1996, no writ), citing Pool

---

[7]*See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108.

v. Ford Motor Co., 715 S.W.2d 629, 634 (Tex. 1986); *see also* Dillard Dept. Stores, Inc. v. Silva, 106 S.W.3d 789, 801 (Tex.App.–Texarkana 2003, pet. filed Jul. 22, 2003).

The purpose of awarding exemplary damages is to punish and deter the wrongful conduct. § 41.001(5); *see also* Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 16-17 (Tex. 1994).  Factors to consider in determining the amount of exemplary damages include:

(1) the nature of the wrong;
(2) the character of the conduct involved;
(3) the degree of culpability of the wrongdoer;
(4) the situation and sensibilities of the parties concerned;
(5) the extent to which such conduct offends a public sense of justice and propriety; and
(6) the net worth of the defendant.

§ 41.011(a); *see also* Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981).

An award of exemplary damages must be based on clear and convincing evidence (*i.e.*, that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established). §§ 41.001(2) & 41.003.  However, the clear and convincing standard does not alter the rules generally applicable when appellate courts review the sufficiency of the jury's findings.  In Re M.D.S., 1 S.W.3d 190, 197 (Tex.App.–Amarillo 1999, no pet.).  Further, in our review

16

of the amount of exemplary damages we must address the evidence or lack thereof with specificity. § 41.013(a).

Ronald testified that his relationship with Brenholtz was as "good of friends as you could have," although they did not socialize outside the office. Robin also testified that Ronald considered Brenholtz a good friend and that the decision to terminate him was difficult. By late 1994, the Agency was running smoothly with Ronald as President and Brenholtz as Vice President. Both Ronald and Robin testified that Robin agreed Brenholtz could work at the Agency as long as he was not an owner or shareholder. Several witnesses testified that Brenholtz was a good agent and was always taking care of his customers. His accounts varied from commercial to personal lines. At the inception of the business relationship, Robin did the accounting at home without a salary. The evidence also established that the Agency did not have much office space available for Robin. The Agency also employed several customer service representatives (CSR).

Several witnesses testified that commissions were tracked through an Agency Management System (AMS) which listed producer codes for an account by initials (*i.e.*, WDB for Brenholtz, RJH for Ronald, and AGY for accounts produced by the Agency). According to Robin, in 1996, Ronald informed her that the Agency was losing money and he suggested she get licensed as an agent. Soon after Robin began working in the office, she and Brenholtz had personality differences.

17

In early 1997, Lynda Emanuel, an underwriter and CSR, ran a customer list on the AMS and noticed that producer codes on some of Brenholtz's accounts had been changed to reflect either Ronald or the Agency as producers. She informed Brenholtz and he confronted Ronald and they argued. Emanuel heard Robin claim that Brenholtz would not be receiving a paycheck because he was not producing, although she knew Brenholtz was producing. Another CSR also testified she discovered some producer codes had been changed from Brenholtz to Ronald and when she attempted to make corrections, she noticed the security clearance had been changed. The CSRs were locked out of the AMS and instructed not to run anymore client lists.

On February 13, 1997, Ronald wrote Brenholtz a handwritten letter notifying him that as of February 14, he was terminated. Ronald began the letter, "I love you. But this isn't working. . . . I've instructed the staff to not allow you into the premises, the locks have been changed, and you are no longer an employee of this agency. (They will call police if you show up)." The letter is signed, "Your friend, Ron Hettler."

Brenholtz immediately obtained a temporary injunction restraining Ronald and the Agency from, among other things, contacting any of Brenholtz's clients, discussing his status with any person other than corporate officers or counsel who need to know, and informing any person that Ronald and the Agency are not aware of how to contact

Brenholtz. The injunction also required immediate delivery to Brenholtz of any customer files, correspondence, or personal property.

A retired insurance broker testified that an agent's book of business is a very valuable commodity. A marketing representative who worked for the Agency for a brief period testified that Ronald brought Brenholtz into the Agency because he would eventually own his book of business.

One of Brenholtz's customers testified that after the termination date, he telephoned the Agency, where the phone was answered "Hettler-Brenholtz" and was not informed that Brenholtz was no longer there. Robin dealt with the customer and sent him a letter dated June 30, 1997, still reflecting "Hettler-Brenholtz" on the letterhead. The yellow pages of the telephone directory also carried Brenholtz's name as part of the Agency in 1997 - 1998, and as late as 1998, the corporate franchise tax return for the Agency continued to list Brenholtz as Vice President.

A CSR who worked at the Agency between 1995 and 1997, and who quit on the date Brenholtz was locked out, testified that Robin told her to inform an individual who had done some marketing in the Agency not to do business with Brenholtz. Evidence was also presented that Brenholtz's parents' homeowners policy was canceled at Ronald's request and had also been coded as Ronald's account. Robin sent facsimilies to companies

regarding approximately 10-15 other accounts belonging to Brenholtz with instructions to either cancel or not renew them.

Other instances of questionable conduct include:

(1) Ronald reported Brenholtz to law enforcement for a theft claim for employee dishonesty;

(2) Brenholtz's mail was not being forwarded regularly as required by the temporary injunction;

(3) Ronald used Agency funds to pay his children's country club dues and Robin's golf dues;

(4) Ronald did not obey the injunction to refrain from sending letters to Brenholtz's clients; and

(5) Brenholtz did not receive all of his files until August 15, 1997, which made it difficult to conduct his business; according to Brenholtz's employee, the files were "messed up."

Evidence was also presented that an agent needs his name in order to do business, and Ronald, Robin, and the Agency continued to carry Brenholtz's name in some aspects of their business.

The jurors were the sole judges of the credibility of the witnesses and the weight to be given their testimony. Also, according to section 41.010, the amount of an award of exemplary damages was not prescribed by a formula or objective criteria, but was to be an amount to be determined within the discretion of the jurors, subject to other provisions of the Code. Considering the multiple acts of questionable conduct which the jury could

20

have deemed to be malicious and harmful to Brenholtz, that the jury was properly charged per the factors, and based on this cold record, we do not agree that the jury abused its discretion nor that the amount of the awards were excessive. Point of error eight is overruled.

Accordingly, the judgment of the trial court is affirmed.

Don H. Reavis
Justice