**ELLIS COUNTY STATE BANK, Tracy Fletcher, John A. Hastings, Jr., And Don Harris, Appellants,**

v.

**Glenn KEEVER, Appellee.**

No. 05–91–02114–CV.

Court of Appeals of Texas, Dallas.

Oct. 31, 1996.

Ben Taylor, Fulbright & Jaworski LLP, Dallas, for appellants.

Robert E. Wood, Jr., Winstead, Sechrest & Minick, Dallas, for appellee.

Before THOMAS, C.J. [1], and MORRIS[2] and JAMES[3], JJ.

## OPINION ON REMAND

JAMES, Justice.

On original submission, this Court affirmed in part and reversed in part the judgment against Ellis County State Bank (the Bank), Tracy Fletcher, John A. Hastings, Jr., and Don Harris (collectively appellants) for malicious prosecution. We affirmed the judgment awarding Glenn Keever actual and punitive damages, as well as prejudgment interest, except for the award of prejudgment interest on the punitive damages. *See Ellis County State Bank v. Keever*, 870 S.W.2d 63 (Tex.App.—Dallas 1992), *aff'd in part, rev'd in part*, 888 S.W.2d 790 (Tex.1994).

In its 1994 opinion, the supreme court affirmed the actual damage awards against the Bank, Fletcher, and Hastings. *Ellis County*, 888 S.W.2d at 794–95. However, the supreme court found no evidence to support liability against Harris. *Ellis County*, 888 S.W.2d at 794. The supreme court remanded the case to us to reconsider the punitive damage award under the *Moriel* [4] procedural standards. *Ellis County*, 888 S.W.2d at 799. We affirmed the punitive damage award under *Moriel*. *Ellis County State Bank v.*

---

1. The Honorable Linda Thomas was a member of the original panel at the time this cause was submitted for decision. Justice Thomas was sworn in as Chief Justice on January 1, 1995.

2. The Honorable Joseph Morris succeeded Justice Kevin Wiggins, a member of the original panel. Justice Morris has reviewed the record and the briefs in this cause.

3. The Honorable Tom James succeeded Justice Joe Burnett, a member of the original panel. Justice James has reviewed the record and the briefs in this cause.

4. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 26 (Tex.1994).

*Keever,* 913 S.W.2d 605, 611 (Tex.App.—Dallas 1995), *rev'd on other grounds,* 915 S.W.2d 478 (Tex.1995).

In its 1995 per curiam opinion, the supreme court remanded the case for this Court to detail all the evidence and explain why that evidence either supports or does not support the punitive damage award. Also, on remand, we are to vacate the entire damage award against Harris. *Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995). Taking into account all of the evidence relevant to the award of punitive damages and applying that evidence under the procedural standards articulated in *Moriel,* we conclude the punitive damage award against the Bank is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## FACTS

Keever executed a 90–day note for $6,000 with the Bank.[5] As collateral for the loan, the Bank took a security interest in office equipment and furniture. Shortly before the note came due, Keever filed for bankruptcy. Fletcher, the executive vice-president of the Bank, attempted to collect the loan from Keever. After the Bank was unable to collect on Keever's loan, the Bank brought the case before the Ellis County Grand Jury seeking an indictment against Keever for hindering a secured creditor. The grand jury issued an indictment. Keever was arrested and put in jail until he posted bail. Keever was arraigned and pleaded not guilty. The criminal district court quashed the indictment, and the district attorney declined to seek reindictment.

Keever sued appellants for malicious prosecution. The trial court granted judgment for Keever on the jury's verdict and awarded, among other damages, $1,535,000 in punitive damages. The jury's verdict awarded $1,000,000 of the punitive damages against the Bank and the remaining $535,000 against Fletcher, Hastings, and Harris. On original submission, appellants challenged only the

excessiveness of the punitive damage award against the Bank. Therefore, our review of the punitive damage award is limited to whether the $1,000,000 punitive damage award assessed against the Bank is excessive.

## PUNITIVE DAMAGES

■■■ Although the typical remedy in a civil case is an award of actual damages, punitive damages may be levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Moriel,* 879 S.W.2d at 16. The major purpose of awarding punitive damages is to punish and deter the wrongful conduct of the party. *Id.* at 29. Our duty is to ensure that defendants who deserve to be punished receive an appropriate level of punishment, while at the same time preventing punishment that is excessive. *Id.* at 17.

### Standard of Review

■■■ We review a punitive damage award under a factual sufficiency standard of review. *Id.* at 30. When conducting a factual sufficiency analysis, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel that a different result is more reasonable. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986). The purpose of the analysis is to allow an appellate court to prevent a manifestly unjust result. *Pool,* 715 S.W.2d at 634. Because the award of punitive damages rests in the jury's discretion, we will not set aside the damages unless after reviewing the entire record, we determine the award is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Moriel,* 879 S.W.2d at 30. Punitive damages must be reasonably proportional to actual damages, but there is no set formula for the ratio between the amount of actual and punitive damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). This determination depends upon the facts of each case.

5. Keever executed the note with the First State Bank of Milford. Harris bought all of First State Bank of Milford's assets, including the loan to Keever. Harris obtained a new charter and re- named the bank Ellis County State Bank. For convenience, we will refer to both banks as "the Bank."

When determining whether the punitive damage award is excessive, we consider the following: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.* at 910. We must detail all of the relevant evidence and explain why that evidence either supports or does not support the punitive damage award in light of the *Kraus* factors. *Ellis County*, 888 S.W.2d at 798.

### Application

■ We note at the outset that the individual *Kraus* factors are not well defined in Texas law. Further, the individual factors often overlap and do not always apply to every award of punitive damages. Nonetheless, we will attempt to analyze the factors separately. *See Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1095–96 (5th Cir. 1991) (noting "inherent problems with the purely subjective [*Kraus* factors]").

### 1. Nature of the Wrong

■ The nature of the wrong refers to the nature of injury or harm caused by the defendant's actions. *See Missouri Pac. R.R. v. Lemon*, 861 S.W.2d 501, 522 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agr.) (death caused by being struck by a train at a crossing the railroad company knew was unsafe); *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 909 (Tex. App.—Texarkana 1987, no writ) (Cornelius, C.J., concurring) (injury purely financial); *Preston Carter Co. v. Tatum*, 708 S.W.2d 23, 24–25 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (transaction purely a business affair and loss entirely financial). *See also* Robert E. Goodfriend, *Preserving Error in Punitive Damage Cases*, 53 Tex. B.J. 1282, 1288 (Dec. 1990) (nature of the wrong appears to refer to the nature of the injury or harm caused by the defendant's actions). Because both "the character of the conduct involved" and "the degree of culpability of the wrongdoer" concern the wrongdoer's conduct, and because none of the other *Kraus* factors appear to

refer to the nature of the injury, we will address the nature of the wrong as meaning the nature of the injury or harm. Thus, the nature of the "wrong" to Keever was both financial and emotional, caused by the Bank's malicious prosecution of him in an attempt to recover on a $6000 loan.

Keever testified he learned of the indictment during a business meeting when the president of Red Oak State Bank handed him the front page of the newspaper. The front page story listed Keever as having been indicted by the Ellis County Grand Jury for hindering a secured creditor.

After learning of the indictment, Keever went home and called Fletcher. He asked her to talk to an attorney so they could "straighten this out." Fletcher responded by asking Keever if "[he was] going to pay [her] or am I going to see you in jail?" Keever called Doug Parks, a criminal defense attorney, and then arranged for bail. He turned himself in to the Ellis County Sheriff. At the Sheriff's office, Keever was placed in handcuffs and a waist chain and walked across the town square to the jail, where he remained until bail was made.

Keever testified that following bankruptcy his finances were beginning to improve until he was indicted. After the indictment, both Keever and business associates testified he underwent substantial changes in his personality, attitude, and work habits. He became severely depressed and suffered from post-traumatic stress disorder. Keever testified that he suffered from "unbelievable" back and neck pain, as well as headaches, caused from stress and tension. He was treated for anxiety that resulted in sleeplessness, lack of concentration, and sexual dysfunction. As a result of the strain, Keever was divorced from his wife. Dr. Bob Gant testified that as a result of his arrest and indictment, Keever should be hospitalized for treatment for six months to one year, and treated on an outpatient basis for no less than five years.

The Bank did not challenge that Keever became severely depressed and suffered from post-traumatic stress disorder; however, it did challenge whether it was Keever's indictment that caused his financial and emotional injuries. The Bank put on evidence of

Keever's stressful background including two tours of duty in Vietnam and work as an undercover informant for the FBI and various police departments. Keever is an assumed name, a result of the federal Witness Relocation Program. Further, Keever had been before grand juries on other occasions without the effect that he claimed from this indictment.[6]

## 2. Character of the Conduct and Degree of Culpability

The character of the conduct involved and the degree of the wrongdoer's culpability refer to evidence of the Bank's state of mind, the degree of its conscious indifference, and any malice in its actions. *See Parker v. Parker*, 897 S.W.2d 918, 930 (Tex.App.—Fort Worth 1995, writ denied) (defendant's degree of indifference toward the law and the rights of plaintiff with the purpose of hurting plaintiff justified punitive damages); *Preston Carter*, 708 S.W.2d at 25 (conduct was not overtly criminal or fraudulent, nor did it spring from ill will or any specific desire to harm plaintiff). The jury resolved the conflicts in the evidence and determined that the Bank committed malicious prosecution. Accordingly, the jury found as an element of malicious prosecution that the Bank acted with malice. The charge of the court defined malice as ill will, evil motive, or reckless disregard for the rights of others. Malice may be established by direct or circumstantial evidence and malice may be inferred from want of probable cause.[7] The charge further instructed the jury that probable cause did not exist if the Bank knew that Keever was not guilty of a

criminal offense. Additionally, the charge instructed the jury that probable cause does not exist if the Bank either falsely represented the material facts or failed to, in good faith, disclose all of the material facts known to it. In answer to these questions, the jury determined that the Bank prosecuted Keever without probable cause and with malice.

Keever testified that Fletcher first began contacting him by telephone shortly after the note was due. Keever told Fletcher of his bankruptcy the first time he talked to her.[8] Fletcher replied they had no notice of it. Keever gave her his bankruptcy case number and the name of his attorney. In subsequent telephone conversations, Fletcher told Keever she did not believe him. Fletcher accused Keever of lying about bankruptcy as a ploy to avoid paying the Bank. Fletcher told Hastings about Keever's bankruptcy, and both Fletcher and Hastings tried to call Tom Glaze, Keever's bankruptcy attorney. Although they were not successful in reaching Glaze, neither Fletcher nor Hastings attempted at that time to verify the bankruptcy with the court, despite the fact that Keever gave the bankruptcy case number to Fletcher.[9] In the fall of 1987, Hastings and Fletcher went to the bankruptcy court and examined Keever's file. At that time they encountered Keever's bankruptcy attorney in the hallway and may have exchanged business cards. Months later, without further investigation, Hastings sent Keever a certified letter stating Fletcher had written "numerous times"[10] and demanded the return of the collateral or the Bank would seek "an appointment with the grand jury." Keever called Hastings after receiving the letter, reminded him once again of his pending

---

6. Keever had been before grand juries on four other occasions; however, he was not indicted.

7. Although the Bank contends that the finding of malice will not support a punitive damage award under *Moriel* because the jury was not required to find that the Bank was actually aware that probable cause was lacking, this issue is not before us. The supreme court remanded this case for us to detail the evidence in light of the new procedural standards articulated in *Moriel*. The supreme court did not instruct this Court to consider the punitive damage award in light of the substantive changes in the law after *Moriel*. *See Ellis County*, 915 S.W.2d at 479; *Ellis County*, 888 S.W.2d at 798–99.

8. Fletcher testified Keever did not tell her of his bankruptcy until months later, after several phone calls.

9. Fletcher testified that she attempted to call the bankruptcy court twice but hung up each time after she was placed on hold for thirty minutes. Her telephone records did not substantiate this testimony.

10. Fletcher had written Keever one demand letter.

bankruptcy, and gave Hastings his bankruptcy case number. Hastings responded to Keever that the bankruptcy had "slipped his mind." In August 1988, through his attorney, Keever arranged for the Bank to pick up the collateral from his house. The Bank failed to keep the appointment. After being reminded of the bankruptcy and failing to keep appointments to collect the collateral, Hastings and Fletcher nevertheless kept the appointment with the grand jury. Thus, the record clearly shows the Bank was aware that Keever had filed for bankruptcy and was not concealing the collateral when it presented its case to the grand jury.

Both Fletcher and Hastings testified that they were truthful before the grand jury. However, in spite of the Bank's claims that it informed the grand jury of Keever's bankruptcy, Mary Shipley, the Ellis County District Attorney, testified that she did not learn of the bankruptcy until *after* the indictment had been issued. Further, Hastings admitted they presented evidence to the grand jury containing inaccuracies. This evidence included letters misstating the number of times Hastings wrote Keever, spoke with Keever, and made demands on Keever. Hastings admitted he did not tell the grand jury the demand letter was sent to Keever while Keever was in bankruptcy or that the Bank had failed to keep appointments to reclaim the collateral.

Both Harris and Fletcher testified that civil litigation is a viable alternative for collection of debts; however, the Bank chose to pursue criminal charges in an attempt to collect on the debt because that was "their best bet." Although the Bank had used civil means to recover collateral in other similar cases, Fletcher admitted the Keever loan was the first time the Bank attempted to use the grand jury to collect on a delinquent loan.

On the other hand, Keever made no attempt to return the collateral to the Bank until the Bank filed a civil suit to recover the collateral. Keever moved the equipment from one house to another during the time that Fletcher was calling Keever in an attempt to recover on the loan. Fletcher testified she made three trips to recover the collateral. She went alone on one occasion and was accompanied on the other two occasions.[11]

The Bank did not receive notice from the bankruptcy court because Keever failed to list the Bank on his list of creditors. When Keever finally amended his schedule of creditors, he listed only "First State Bank" and did not give a mailing address. Keever never included the Bank on the list of creditors. However, no later than the fall of 1987, the Bank had actual knowledge of Keever's pending bankruptcy.

Further, Keever manufactured evidence to assist him in this lawsuit. Appellants introduced a letter, purportedly from the Texas Department of Human Services (TDHS), stating that TDHS was going to recommend to the Florida authorities to remove the child Keever and his wife were in the process of adopting. Keever admitted at trial that he wrote the letter; however, he had a change of conscience after writing it. He had never intended to use it in this lawsuit. He mistakenly gave the letter to his attorney in a group of papers in response to a discovery request.

### 3. Situation and Sensibilities of the Parties

The situation and sensibilities of the parties concerned refers to evidence of such things as remorse, remedial measures, and ability to pay the punitive damages. *See Missouri Pac. R.R.*, 861 S.W.2d at 522. The Bank showed no remorse, as evidenced by the fact that at the hearing when the indictment was quashed, Hastings stood up in the courtroom and told Parks he was going to "go upstairs and get another indictment."

---

11. Fletcher testified Keever scheduled an appointment to pick up the collateral in December 1987. She and her ex-husband went to Keever's house, but Keever was not home. Fletcher and her ex-husband waited for fifteen to twenty minutes. Fletcher's ex-husband testified he did not remember going to Keever's house with Fletcher and waiting. Fletcher also testified she and Delbert Timmerman went to Keever's Lancaster home in July or August 1987. Timmerman testified he did not go with Fletcher to Keever's home in Lancaster. Timmerman also testified Fletcher told him it would be in his best interest not to talk to Keever's lawyers.

Hastings later wrote a letter to Shipley stating that although "the district court quashed the indictment on Glenn Keever wherein the Ellis County State Bank was the victim ... [t]he bank still desires to pursue its criminal remedy and would appreciate your advising me if we need to meet with the grand jury again and, if so, on what date we can meet with the grand jury." There was no evidence that the Bank felt any remorse or would change its policies regarding future collection efforts.

On the other hand, and most compelling for the Bank's argument to reduce the punitive damage award, is evidence of the Bank's ability to pay the punitive damage award. Harris testified that the total capital of the Bank was $770,000, as shown on its Statement of Condition dated June 30, 1990. He testified the figure correctly stated the net worth of the Bank's assets. The statement listed total assets of $7,933,000, including cash on hand and due from banks of $384,-000; federal funds sold of $1,050,000; certificates of deposit of $896,000; and U.S. Treasury securities of $400,000. Further, we note unrealized gains on the Bank's assets would not be reflected in the Bank's financial statement until the investments were sold. We agree with the Bank that the purpose of punitive damages is to punish, not to destroy; nevertheless, we conclude a rational jury could have found that the Bank's net worth and its ability to pay punitive damages were greater than the figure Harris assigned to the net worth of the assets shown on the Bank's published Statement of Condition. Because net worth is just one consideration for the jury in determining an appropriate punitive damage award, Harris's testimony is not dispositive in our review of the punitive damage award. There is nothing in the record before us to indicate the jury disregarded the evidence or determined the amount of punitive damages based upon passion or prejudice. *See Missouri Pac. R.R.*, 861 S.W.2d at 522.

### 4. Extent the Conduct Offends a Public Sense of Justice and Propriety

Finally, we examine the evidence to consider the extent the conduct of the wrongdoer offends a public sense of justice and propriety. Fletcher testified she had attempted to collect the collateral on several occasions but Keever failed to meet her to allow her to do so. She further testified Keever promised to execute a new note and to make payments but failed to live up to his promises. The Bank had exhausted all other efforts to gain Keever's cooperation before the Bank sought an appearance before the Ellis County Grand Jury. The Bank had never received notice from the bankruptcy court that Keever was attempting to discharge the Bank's note in his bankruptcy.

We have detailed under other *Kraus* factors, above, the evidence to the contrary. Based on all of the evidence, we conclude a rational jury could have found the Bank's conduct offended the public sense of justice and propriety. A rational jury could have found that Fletcher and Hastings made misrepresentations to the district attorney and the grand jury with the acknowledged purpose of obtaining a felony indictment to compel Keever to pay a debt barred by bankruptcy. The jury heard testimony that, as part of a plea bargain, the district attorney demanded Keever pay the Bank's note in exchange for reduction of the charge to a misdemeanor. The jury had evidence that the Bank's purpose in pursuing the indictment was an attempt to collect on the debt because that was "their best bet."

The presumptions of good faith and probable cause, which protect citizens who report criminal conduct to authorities, are protections grounded in sound public policy. *See Ellis County*, 888 S.W.2d at 794. The protection afforded to complainants, however, carries with it a concomitant obligation to use criminal prosecution for its very limited role in a free society. *See Browning–Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288, 290–91 (Tex.1994); *Ellis County*, 913 S.W.2d at 610. "If one makes a misrepresentation to the prosecuting authority in order to secure an indictment, he cannot rely on a presumption in a law known not to have been violated." *See Ellis County*, 888 S.W.2d at 794–95 n. 8. The Bank admitted it had other legal means to obtain control of the collateral. It admitted it was using writs of sequestration to collect collateral on other loans in default.

Misrepresenting material facts to invoke the power of the grand jury for the purpose of forcing Keever to pay a discharged obligation or face incarceration offends a public sense of justice and propriety.

## Conclusion

The jury resolved the conflicts in the evidence and determined that the Bank committed malicious prosecution. The jury found the Bank acted with malice. Further, the jury determined that to punish the Bank, and to deter the Bank from this conduct in the future, the Bank should pay Keever $1,000,-000.

The evidence amply demonstrated that Keever's injuries resulted from the Bank's wrongful and malicious use of the criminal justice system in an effort to collect a $6000 loan. A rational jury could have found that instead of simply going to Keever's home and getting the collateral, or using remedies of a civil lawsuit, the Bank chose to mislead the grand jury to obtain an indictment to collect its loan through the criminal justice system. A rational jury could have also found that the nature of the wrong, the character of the conduct, the Bank's culpability, and the public's sense of justice required the Bank to pay substantial punitive damages. The Bank has not shown that the punitive damage award was the result of passion rather than reason.[12] After reviewing all of the evidence relevant to the award of punitive damages, we conclude the punitive damage award against the Bank is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

We affirm the $1,000,000 punitive damage award assessed against the Bank. We vacate the entire damage award against Harris. See Ellis County, 915 S.W.2d at 479.

---

**12.** We note Texas courts have upheld awards of exemplary damages in ratios to actual damages considerably higher than the approximately nine to one ratio present in this case. See Greenhalgh v. Service Lloyds Ins. Co., 787 S.W.2d 938, 939 (Tex.1990) (sixteen to one ratio); see also Shandee Corp. v. Kemper Group, 880 S.W.2d 409, 411 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (twenty to one ratio); Beacon Nat'l Ins. Co. v. Reynolds, 799 S.W.2d 390, 398 (Tex.App.—Fort Worth 1990, writ denied)(twenty-eight to one ratio). A ratio of 2,250 to 1 has been approved. See Donnel v. Lara, 703 S.W.2d 257, 261–62 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).