COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC. d/b/a Las Colinas Medical Center, Appellant

v.

Athena HOGUE, Individually and as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher Hogue and Robert Hogue, III, Appellees.

No. 05–03–00279–CV.

Court of Appeals of Texas, Dallas.

April 13, 2004.

Rehearing Granted May 6, 2004.

R. Brent Cooper, Diana L. Faust, Brad M. Lamorgese, Ashley E. Frizzell, Cooper & Scully, P.C., Dallas, TX, for Appellant.

Eric D. Pearson, Mark S. Werbner, Sayles Lidji & Werbner P.C., Melvin Wolovits, Joshua Bernstein, Wolovits & Chaiken, Dallas, TX, for Appellee.

Before Justices JAMES, BRIDGES and RICHTER.

## OPINION

Opinion by Justice RICHTER.

Appellant brings four issues on appeal asking this Court to determine whether this case constitutes a health care liability claim falling within the strictures of the Medical Liability and Insurance Improvement Act [1] ("MLIIA") and thus subject to the statutory damages cap; whether the trial court erroneously failed to properly submit a contributory negligence issue to the jury; whether there was factually sufficient evidence to support the jury's award of damages for pecuniary loss, loss of companionship and society, mental an-

---

1. Tex.Rev.Civ. Stat. Ann. art. 4590i (Vernon Supp.2003). Repealed effective September 1, 2003 and re-codified with changes at Tex. Civ. Prac. & Rem.Code Ann. § 74.001–74.507 (Vernon Supp.2004).

guish, and future loss of inheritance; whether there was legally or factually sufficient clear and convincing evidence to show harm was caused by gross neglect thereby supporting the exemplary damages award; and whether the newly amended pre-judgment and post-judgment interest rate should be applied in this case. We reverse and render in part, and affirm the judgment in all other respects.

## Factual Background

In March 1998, Robert Hogue, Jr., began to feel dizzy and had an upset stomach. He went with Athena, his wife, to his family doctor and was diagnosed with possible pneumonia. He was scheduled for a return visit to the doctor after the weekend, but Athena called the on-call doctor for his family practitioner on Sunday evening because his phlegm was tinged pink. The Hogues arrived early for the doctors appointment the next day, and the doctor immediately had Robert taken to the hospital by ambulance for a chest x-ray due to suspected fluid in Robert's lungs.

Robert informed the ER doctor at defendant hospital he did not have a cardiac condition, despite the fact he had been diagnosed previously with a heart murmur. By 9:10 a.m., the ER doctor called a pulmonologist to handle Hogue's care. The pulmonologist was not on-call at defendant hospital, and the hospital did not have an on-call list by specialty. Hogue was sent to the intensive care unit. Because the pulmonologist was not on-call and was seeing other patients at another area hospital, he did not arrive at defendant hospital until over four hours had passed.

Soon after the pulmonologist arrived, he performed a surgical procedure to measure pressure in the blood vessels. There-

after, he requested that Robert be given an echocardiogram "now." The pulmonologist then left the hospital to care for his other patients.

The hospital had a contract service provider to handle its echocardiogram needs. The contract did not provide for emergency echocardiograms on an emergency basis. There was no guaranteed response time to a request for emergency or "stat" echocardiograms. Accordingly, the contract service provider arrived over two and a half hours later, between 6:00 and 6:15 p.m. Within minutes, he determined Robert had recently experienced a severe leakage of his heart mitral valve. A cardiologist was called, and he determined Robert required immediate open heart surgery. As defendant hospital did not offer open heart surgery procedures, Robert was transferred to another hospital, where he arrived at 8:46 p.m. Within 15 minutes of arrival, he "coded," and after an hour of resuscitation attempts, was pronounced dead.

## Healthcare Liability Claim

■ In their first issue, appellants claim the trial court erred when it determined that the MLIIA did not apply to appellees' claims because its suit was based not only upon errors and omissions of medical staff, but also upon asserted administrative negligence of the hospital occurring some months before decedent's admission[2]. The hospital in this case opened for business approximately six months before decedent's admission. Appellees, in post-judgment motions and relying on our decision in *Rose v. Garland Cmty. Hosp.*, 87 S.W.3d 188 (Tex.App.-Dallas 2002, pet. granted), claimed the hospital was negli-

---

**2.** Effective September 1, 2003, a "health care liability claim" now includes professional or administrative services. Tex. Civ. Prac. & Rem.

Code Ann. § 74.001(a)(13) (Vernon Supp. 2004)

gent when it did not arrange for echocardiogram services on an emergency basis, failed to establish an effective, documented system for providing on-call coverage of physicians by specialty to its emergency room, and failed to communicate the capabilities and limitations of the hospital to its staff and to the community at large. Relying on *Rose*, the trial court agreed these claims were not within the purview of the MLIIA as it then existed and accordingly uncapped the previously capped damages. *See*, TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02(a) (Vernon Supp.2003). Despite the fact *Rose* was issued after this case was decided by jury verdict, the operative pleading, the ninth amended petition, can be fairly read to allege the sort of claim approved by this Court in *Rose*.

■ Our review of questions regarding the applicability of the MLIIA is de novo. *Rose*, 87 S.W.3d at 190. In *Rose*, we held a claim for negligent credentialing/recredentialing was not a health care liability claim and, therefore, was not governed by the MLIIA. *Id.* at 193. We note malicious credentialing is a distinct cause of action against a hospital for acting with malice in credentialing a doctor or in peer review. *KPH Consol., Inc. v. Romero*, 102 S.W.3d 135, 143 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

In holding negligent credentialing/recredentialing was not subject to the MLIIA, we relied on the following factors unique to that cause of action. A credentialing claim is not a cause of action for treatment or lack of treatment. *Rose*, 87 S.W.3d at 191–92. After dispensing with that threshold inquiry, we then looked to whether or not the hospital departed from accepted standards of medical care, health care, or safety. *Id.* at 192. We then observed a hospital cannot practice medi-

cine. *Id., see* TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon 2004). Health care refers to acts or omissions that occur during a patient's medical care, treatment, or confinement. *Rose*, 87 S.W.3d at 192. In addition, acts related to safety must have occurred during a patient's medical care, treatment, or confinement. *Id.*

In contrast, appellees' claims do not make it past the threshold inquiry. We look beyond the pleadings to the underlying nature of the claims. *Id.* at 191. Here, the gist of appellees' claims are the hospital failed to promptly provide decedent with an echocardiogram and transfer him to another hospital equipped to handle his needs. These claims clearly complain of a lack of treatment. The complained of omissions on the part of the hospital are an inseparable part of the medical services provided to decedent. For a claim to fall under the MLIIA, the acts or omission that form the factual basis of the claims must be an inseparable part of the rendition of medical services. *Id.*

We sustain the first issue of appellant.

### Contributory Negligence Instruction

■ In its second issue, appellant claims the trial court erred by failing to include a contributory negligence issue in the jury charge as part of the liability question when some evidence was presented that decedent failed to inform the emergency room personnel he had a cardiac condition. Appellant further claims the trial court's later inclusion of a contributory negligence issue in the exemplary damages portion of the trial did not render the error, if any, harmless. In the alternative, appellant claims the jury's negative answer to the contributory negligence question was not supported by legally sufficient evidence [3].

3. Appellant did not brief this aspect of its second issue, and has waived any alleged

Rule of civil procedure 278 requires the trial court to submit instructions and definitions to the jury as are necessary to enable the jury to render a verdict. *See* Tex.R.Civ. P. 278; *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992); *Rosell v. Central W. Motor Stages, Inc.,* 89 S.W.3d 643, 653 (Tex.App.-Dallas 2002, pet. denied). We review the trial court's submission of instructions and jury questions under an abuse of discretion standard. *Rosell,* 89 S.W.3d at 653. The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury. *Id.* This broad discretion is subject only to the limitation that controlling issues of fact must be submitted to the jury. *Id.* Controlling issues may be submitted to the jury by questions, instructions, definitions, or through a combination thereof. *Id.* When submitting the jury charge, a trial court is afforded more discretion when submitting instructions than when submitting questions. *Id.*

To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety to determine if the trial court abused its discretion. *Id.* A reversal is warranted when the trial court denies a proper submission of a valid theory of recovery raised by the pleadings or the evidence. *Id.* A reversal is also warranted when the trial court denies a proper submission of a valid defense theo-

ry that is raised by the pleadings or the evidence. We do not reverse unless harm results. *Id.* For harm to result, the error must probably cause the rendition of an improper judgment. Tex.R.App. P. 44.1(a)(1).

After reviewing the entire charge, the pleadings, and the evidence produced at trial, we cannot conclude the way in which the trial court submitted the contributory negligence issue was in error or harmful. The issue was ultimately submitted, and the jury answered it in the negative. The fact the issue was submitted after the liability issue is inapposite. Even were the submission timing in error, it cannot be said the error probably caused the rendition of an improper judgment. The trial court did not abuse its discretion. We overrule appellant's second issue.

### Factual and Legal Sufficiency Issues Concerning Damages

In appellant's third and fourth issues [4], it claims the evidence to support the jury's finding of gross neglect is factually and legally insufficient, the evidence to support the jury's award of actual damages is factually insufficient, and the award of exemplary damages is not supported by clear and convincing evidence.

### A. Standard of Review for Factual and Legal Sufficiency when the Burden of Proof was by a Preponderance of the Evidence

error. Failure to cite any authority constitutes waiver of the alleged error. *Kang v. Hyundai Corp.,* 992 S.W.2d 499, 503 (Tex. App.-Dallas 1999, no pet.)

4. Appellant's designation of issues three and four are apparently reversed in its argument and authorities. As noted in another recent case involving the same appellant and the same counsel, "appellant's issues are extremely long and multifarious .... we cannot

tell which arguments and authorities sections in the brief address which issues. Consequently, we address only the issues raised by the arguments presented in the body of appellant's brief." *Columbia Med. Ctr. of Las Colinas v. Bush,* 122 S.W.3d 835, 841 (Tex.App.-Fort Worth 2003, pet. filed). We find the same factors present in the instant case, and deal with the problem in like manner.

 In the evaluation of legal sufficiency, we determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex.1998). If an appellant is attacking the legal sufficiency of an adverse finding of an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. E.g., W. Wendell Hall, *Standards of Review in Texas*, 34 St. Mary's L.J. 1, 159 (2002). Challenges to the legal sufficiency must be sustained if the record reflects one of the following: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.*; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998).

 If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. W. Wendell Hall, *Standards of Review in Texas*, 34 St. Mary's L.J. 1, 172 (2002). In the evaluation of factual sufficiency, this Court must consider all of the evidence including that which supports the finding and that which is contrary to the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989) (per curiam). This Court should set aside the jury's verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

**B. Standard of Review for Factual and Legal Sufficiency when the Burden of Proof was by Clear and Convincing Evidence**

 The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency challenges in light of the clear and convincing burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264–268 (Tex.2002)(discussing legal sufficiency review in termination of parental rights appeal); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)(discussing factual sufficiency review in termination of parental rights appeal). Both legal and factual sufficiency reviews of a finding required to be based on clear and convincing evidence must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25.

 With respect to a legal sufficiency point, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief of the matter required to be proved by clear and convincing evidence. *C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm conviction or belief, then the

evidence is factually insufficient. *J.F.C.*, 96 S.W.3d at 266; *In re: J.R.K.*, 104 S.W.3d 341 (Tex.App.-Dallas 2003, no pet.).

## C. Gross Neglect–Applicable Law

For gross negligence to support an award of exemplary damages, it must be proven by clear and convincing evidence. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(3) (Vernon Supp.2004). Hence, we apply the new standards for factual and legal sufficiency review in cases where the burden of proof is clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25.

▇▇▇ Gross negligence includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Ellender*, 968 S.W.2d at 921; *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *Ellender*, 968 S.W.2d at 921; *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995); *Moriel*, 879 S.W.2d at 22–23. Under the first element, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Ellender*, 968 S.W.2d at 921; *Ung*, 904 S.W.2d at 641; *Moriel*, 879 S.W.2d at 22. Under the second element, actual awareness means that the defendant knew about the peril, but its acts or omissions demonstrated it did not care. *See Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993). Circumstantial evidence is sufficient to prove either element of gross negligence. *See Moriel*, 879 S.W.2d at 22–23; *Wal–Mart Stores*, 868 S.W.2d at 327.

## D. Gross Neglect–Objective Element–Application of Law to Facts

### 1. Echocardiogram "Stat" capability:

▇▇▇ Appellant asserts there is legally insufficient evidence of an extreme risk to decedent arising from appellant's omissions. Appellant argues it does not make financial sense for all hospitals to serve all patients, and if a hospital does not have a volume of a particular type of service, one alternative is to utilize the services of an outside contractor. The appellant further argues there are no clear standards concerning the timeliness of an echocardiogram emergency or "stat" order, and a two hour response time was typical of its selected contractor and consistent with his response time when a guaranteed response time was applicable.

Appellees counter that from the time appellant opened for business and contracted for outside echocardiogram services, there was a high probability a life-threatening medical emergency requiring "stat" echocardiogram services would occur. The appellant's Director of Outpatient Services testified it was "obvious" and "elementary" a hospital emergency department is going to need echocardiograms on a "stat" or emergency basis. He testified a quality study by an echo technician is an important service in patient care because it is a diagnostic tool a cardiologist uses to diagnose and anticipate treatment. He further testified the timeliness of an echocardiogram is important and if he were approached about the need for a "stat" echocardiogram while at the appellant hospital, he would have advised to start the process to transfer the patient to another hospital that could handle the patient's needs.

These facts indicate that from the hospital's point of view, there was a high probability of extreme risk. Despite this knowledge, appellant failed to enter into a contract for echocardiogram services on a "stat" basis.

### 2. Lack of on-call list by specialty:

██ The appellant claims the lack of an on-call list by speciality is inapposite because it is the physician's decision on whether or not to involve an additional physician. It also asserts an emergency room physician is not obligated to use an on-call list. Appellant asserts that because the emergency room doctor called a specialist who returned the call within 30 minutes and accepted the case, the on-call system met the standard of care.

However, appellant's COO Pat Sullivan testified the hospital was responsible to ensure there were sufficient staff on duty to care for patients, and it would be a problem if a doctor did not know whom to call if a specialist were needed. She would be critical of any hospital that did not have an effective process for having on-call physicians listed by speciality. Further, federal guidelines require an on-call list by specialist. Although a specialist was contacted, due to his other commitments at other hospitals and the fact he was not "on-call," it took over four hours for him to reach the hospital.

These facts indicate that from the hospital's point of view, there was a high probability of extreme risk by not having a list of on-call physicians by specialty. Appellant advertised itself in the community as having a full service emergency room, open 24 hours a day, seven days a week. Despite this knowledge of extreme risk and the advertisements concerning full service, appellant failed to create an on-call list by specialty as required under federal guidelines.

### E. Gross Neglect–Subjective Element–Application of Law to Facts

██ Appellant claims it was not subjectively aware of the risk of not providing echocardiogram services on a "stat" basis and of not having an on-call list by specialty. The hospital claims it relied on the advice of the chief of medicine that the need for "stat" echo services would be low. It also argues the cardiologists and physicians were happy with the contract echocardiogram services up until the time of decedent's death.

The hospital was open for approximately six months before the death of decedent. The lack of any complaints from physicians is, therefore, not persuasive. The Director of Outpatient Services testified the hospital had actual knowledge that there would be a need for echocardiogram services originating from the emergency room. He also testified the hospital knew that it could arrange for echocardiogram on-call services on a "stat" basis for an additional charge of $3 per hour. It knew that if it did not pay the fee, there was no guarantee services would be available. In conscious indifference to the safety and welfare of others, it chose not to pay the fee and guarantee a response time. Furthermore, the hospital did not communicate to its physicians and nurses that an echocardiogram could not be guaranteed on a "stat" basis. Concerning the emergency on-call list by specialty, appellant advertised it had a full service emergency room, yet it knew it did not have an on-call list of specialists to handle specific types of cases as needed. From the foregoing facts, the jury could have reasonably concluded the hospital had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

Because, under these facts, a fact finder could reasonably form a firm belief or

conviction that the hospital was grossly negligent, we conclude there was legally and factually sufficient evidence to support the jury's finding that appellant was grossly negligent.

### F. Factual Sufficiency–Actual Damages

■ Appellant has only challenged the factual sufficiency of the evidence concerning this aspect of damages. We review actual damages under the traditional factual sufficiency review standard because the burden of proof was a preponderance of the evidence. *See, e.g., Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641–42 (Tex. 1987); *S.W. Bell Tel. Co. v. Garza,* 58 S.W.3d 214, 234 (Tex.App.-Corpus Christi 2001, pet. granted).

Appellant claims three areas of actual damages are unsupported by factually sufficient evidence: (1) past and future pecuniary loss, (2) past and future loss of companionship, society and mental anguish, and (3) loss of inheritance. We shall detail the evidence supporting each finding, and contrary to each finding, in turn.

### Past and Future Pecuniary Loss

■ In a wrongful death case, pecuniary loss is defined as the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the wrongful death beneficiary would, in reasonable probability, have received from the decedent had he lived. *Moore v. Lillebo,* 722 S.W.2d 683, 687 (Tex.1987). The evidence supporting the award for past and future pecuniary loss included testimony by an economist as to specific amounts for loss of wages, earning capacity and household services. Appellees causation expert testified decedent would most likely have been able to live and work until age seventy had he had an uneventful mitral valve repair surgery.

The evidence contrary to the award for past and future pecuniary loss is negligible. Appellant claims that when the awards in this case are compared to other reported cases, the amounts appear excessive. However, appellant does not point to a case where this factor is determinative, and we cannot locate any. Appellant then attacks the testimony of the economist on the grounds that he did not contact decedent's doctors or his employer to ascertain whether or not decedent could have worked until age 70.

On these facts, and on the lack of evidence to the contrary, we conclude the jury finding is not so weak as to be clearly wrong and manifestly unjust.

### Past and Future Loss of Companionship, Society and Mental Anguish

■ Damages for loss of companionship and society compensate for a loss of positive benefits that flowed to the family for the decedent's having been part of the family. *Moore,* 722 S.W.2d at 687–88. Companionship and society are defined as the positive benefits flowing from the love, comfort, companionship and society the familial survivors would, in reasonable probability, experience if the decedent lived. *Id.* at 688.

■ Mental anguish represents an emotional response to the wrongful death itself. *Id.* at 687. It is defined as the emotional pain, torment, and suffering the familial survivors would, in reasonable probability, experience from the death of a family member. *Id.* at 688.

■ In awarding damages for loss of companionship and society and for mental anguish, the jury may consider: (1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of

the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. *Id.*

The evidence supporting the award for past and future loss of companionship, society and mental anguish includes unchallenged testimony that decedent and his wife were married for 26 years, and when he died, "half of [her] died"; decedent spent a lot of time with his wife and two sons; his sons were everything to him, they had a great bond and were best friends; decedent coached his sons in sports; overall, the relationship of decedent with his family was strong and good. There was no evidence to the contrary. Again, we cannot say the jury finding was so weak as to be clearly wrong and manifestly unjust.

### Loss of Inheritance

Loss of inheritance damages are defined as the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing premature death. *Id.* at 687. For loss of inheritance damages to be awarded, there must be evidence that plaintiffs would probably have been the beneficiaries of decedent's estate, and evidence from which the amount of that estate can reasonably be calculated. *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 323–24 (Tex. 1994).

The evidence supporting the award for loss of inheritance includes life expectancy tables introduced into evidence which indicate decedent's wife would live 6.9 years beyond that of decedent's natural life had he lived. There was also evidence she had no health problems. Appellant does not challenge whether or not decedent's sons would naturally outlive him.

In addition, there was evidence introduced from which the amount of the estate could be reasonably calculated. An economic expert testified that based upon prior history, it was expected that 85% of decedent's salary would go towards supporting his family. The 15% savings rate was founded upon the historical fact that decedent contributed 5% of his salary to a 401K plan and an estimated savings rate of 10%. At the time of his death, decedent had accumulated $65,000 in cash and money market funds, almost $51,000 in common stock, and equity in his home of $85,000. At the time of his death, these assets combined values were over $200,000.[5] Finally, the economic expert provided a detailed analysis wherein he arrived at a dollar amount for the future expected estate of decedent. He relied on the following factors: past and future lost earning capacity, past and future loss of household services, prior earnings from employment records and tax returns, likely raises and bonuses, past and future fringe benefits, 401K contributions and employer matching contributions, decedent's personal consumption, life expectancy tables, decedent's savings during his lifetime, and the fact his will left his entire estate to his wife.

Appellant claims past history does not accurately predict the future performance of decedent's investments, expenses and health. However, to provide that level of evidentiary detail appellant seeks would eviscerate lost inheritance damages. The Texas Supreme Court observed that the argument that loss of inheritance damages

---

5. The parties do not address the effect, if any, of Texas community property laws on decedent's ownership interests in the foregoing assets. Because the issue is not before us, we decline to address it.

are inherently too speculative and should never be awarded "has not been disproved." *Thompson,* 903 S.W.2d at 323. There are certain vagaries inherent in proving what someone would have inherited. *Id.* For example, how can one prove with reasonable probability that ordinary family expenses would not consume all of the decedent's income, or whether the ordinary circumstances of life would not have exhausted any estate? *Id.* However, it is not for this Court to revisit the wisdom of loss of inheritance damages. Accordingly, we conclude that the evidentiary detail presented to the trier of fact was sufficient to support this aspect of the damages equation, and the jury finding was not so weak as to be clearly wrong and manifestly unjust.

## G. Exemplary Damages–Clear and Convincing Evidence

A claimant must prove by clear and convincing evidence the elements of exemplary damages. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(b) (Vernon Supp.2004). Accordingly, we apply the new standards for factual and legal sufficiency review in cases where the burden of proof is clear and convincing evidence. *J.F.C.,* 96 S.W.3d at 265–66; *C.H.,* 89 S.W.3d at 25.

■ Appellant claims that the $21,000,000 exemplary damages awarded by the jury-reduced to $3,969,081 in the Amended Final Judgment pursuant to the statutory cap-were not supported by clear and convincing evidence [6]. Punitive or exemplary damages must be reasonably proportional to actual damages, but there is no set formula for the ratio between the amount of actual and punitive damages.

*Alamo Nat'l Bank v. Kraus* 616 S.W.2d 908, 910 (Tex.1981).

This Court is required to address the evidence with specificity concerning liability for the amount of exemplary damages. TEX. CIV. PRAC. & REM.CODE ANN. § 41.013 (Vernon Supp.2004). We must detail all of the relevant evidence and explain why that evidence either supports or does not support the exemplary damages. *Ellis County State Bank v. Keever,* 936 S.W.2d 683, 686 (Tex.App.-Dallas 1996, no writ). Because the award of exemplary damages was based on gross negligence, the evidence delineated under that section above is likewise appropriate to consider this issue.

The jury awarded total actual damages of $9,196,155 (does not include stipulated funeral expenses of $13,386) and $21,000,000 in exemplary damages. The trial court initially entered judgment on August 30, 2002, for actual damages in the amount of $1,471,405.20 after application of the statutory cap contained in Section 11.02 of the MLIIA. TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02(a) (Vernon Supp. 2003). The trial court also awarded $3,356,296 in exemplary damages. On December 3, 2002, after deciding that the cap was not applicable, the trial court entered an amended final judgment awarding $9,209,541 in actual damages (includes $13,386 in stipulated funeral costs) and $3,969,541 in exemplary damages.

As we have decided in this opinion that the statutory cap is applicable to this case, the numbers applicable to the first judgment are the proper measure of damages. We note that the exemplary damages awarded by the trial court in the first judgment are roughly 36.5% of the actual

---

**6.** By our resolution of the first issue, we rendered judgment that the damages cap of Section 11.02(a) of the MLIIA was applicable. TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02(a) (Vernon Supp.2003). Thus, the proper calculation for exemplary damages is that contained in the original Final Judgment. Thus, the amount of exemplary damages should have been $3,356,296.

damages awarded by the jury, and roughly 2.28 times the actual damages awarded by the trial court after application of the statutory cap. Thus, the exemplary damages awarded in the judgment are reasonably proportioned to the actual damages. *Kraus,* 616 S.W.2d at 910; *Keever,* 936 S.W.2d at 685.

In considering the quantum of exemplary damages to award, the trier of fact is directed to consider the following evidence, if any, relating to:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.011 (Vernon Supp.2004); *Kraus,* 616 S.W.2d at 910; *Keever,* 936 S.W.2d at 686.

### 1) The Nature of the Wrong

██ The nature of the wrong in this case is the untimely death of decedent. *See Keever,* 936 S.W.2d at 686. The evidence at trial showed that decedent was very close to all of his family and that his death was devastating to all of them. Decedent had been married to his wife for over 25 years, and they had two sons in college. Decedent had always been very involved in his sons' lives, and visited them at college often. One of the sons testified that he spoke on the phone with his father several times a week, and that his relationship with his father was changing from one of father to son, to one of best friends.

### 2) Character of the Conduct and Degree of Culpability

██ The character of the conduct involved and the degree of culpability of

the wrongdoer refer to evidence of the hospital's state of mind, the degree of its conscious indifference, and any malice in its actions. *Keever,* 936 S.W.2d at 687. After resolving conflicts in the evidence, the jury determined the hospital had committed gross negligence. There is evidence in the record that tends to establish the hospital was aware that it needed prompt "stat" echocardiogram services from time to time, but, nevertheless, the administration did not consult with anyone concerning the adequacy of their emergency echocardiogram contract or the implications of not having "stat" echocardiogram capability. The hospital did not have an in-house echo-technician, and the contract services it used did not provide for a guaranteed response time. A hospital should communicate to its physicians and staff its capabilities and limitations. The lack of "stat" echocardiogram testing was not communicated to the treating physician in this case, or other physicians or staff. It is a basic principle and a federal guideline that a hospital should have an on-call list by speciality, but the hospital in this case did not. The foregoing shows the hospital was subjectively aware of the need for "stat" echo services, it chose not to pay for such services, it failed to so inform its staff and physicians, and it did not have an on-call list by specialty to assist an ER physician in getting appropriate assistance when required. These facts show the hospital was consciously indifferent to the needs of any patient who might come to the hospital with a cardiac condition, and it was consciously indifferent to the needs of decedent.

### 3) Situation and Sensibilities of the Parties

██ The situation and sensibilities of the parties refers to such things as

remorse, remedial measures and the ability to pay exemplary damages. *Keever*, 936 S.W.2d at 688. Here the jury could have reasonably concluded the hospital did not accept any blame or exhibit any remorse over the death of decedent, but rather made up after-the-fact explanations for what occurred.

There was testimony by the hospital administration that the on-call system was effective and will not change, there is no harm in allowing a critically ill patient to stay in the intensive care unit for one hour without seeing a doctor, and that decedent in this case got real service real fast. Although two corporate representatives were present in the gallery during the bifurcated stage of the proceedings and were even introduced to the jury, neither took the witness stand to express remorse or explain what remedial steps, if any, they planned to take.

The contract echocardiogram provider testified that he offered to provide the hospital with "stat" echocardiogram services with a guaranteed response time for a nominal additional fee, but the administration was never interested. The person in administration who made this determination initially testified in a deposition he had not consulted with the medical staff regarding the implications of the echocardiogram contract. At trial, his testimony changed to assert that he had consulted medical staff. He explained the change in testimony by claiming his memory had improved over time. That individual was promoted following this incident with no investigation into his conduct.

The hospital administration also asserted the nurse manager was working on the ER floor at the time of the incident and was not with accreditation surveyors. That assertion was contrary to that witness's handwritten notes. When confronted with the evidence, that person testified she did not know if it was her handwriting. Under cross-examination, she changed her testimony to reflect that it could be her handwriting. She then changed her testimony again to confirm it was indeed her handwriting.

The net worth of the hospital was not entered into evidence. However, there was evidence from which the jury could infer a substantial net worth. The hospital advertised that it was a full service hospital offering the latest in high-tech equipment. The hospital planned to construct a new acute care facility in Irving, Texas. The evidence further shows that substantial money was spent marketing and advertising the new hospital.

## 4) Extent the Conduct Offends a Public Sense of Justice and Propriety

Courts are reluctant to substitute their own sense of justice and propriety for that of a jury drawn from a cross section of the community. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 620 (Tex. App.-Waco 2000, pet. denied). The fact the jury awarded $21,000,000 in exemplary damages before imposition of the statutory cap says much about how the conduct of appellant offended the public sense of justice and propriety. From all of the evidence so far delineated in this portion of the Court's opinion, the jury could have rationally and justifiably been offended by what it perceived as arrogance, indifference, and an attempt to cover up wrongdoing, and of the hospital's decision to put profit over patients.

After considering all of the evidence and the factors set forth above, we conclude the evidence supporting the exemplary damages award of $3,356,296 is factually and legally sufficient, because under these facts, a fact finder could reasonably form a firm belief or conviction that the elements required to prove exemplary damages

have been satisfied. We overrule appellant's fourth issue.

## Judgment Interest Rate

In an issue raised in its reply brief, appellant requests that we apply the amended version of the pre- and post-judgment interest statutes and reduce the interest to a rate to five percent. Effective September 1, 2003, the post-judgment interest rate changed from a minimum of ten percent to a minimum of five percent. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 676, §§ 1, 2003 Tex. Gen. Laws 2096, 2097 (codified at Tex. Fin.Code Ann. §§ 304.003(c) (Vernon Supp.2004)). Before September 1, 2003, the post-judgment interest rate was the fifty-two-week treasury bill rate, but in no case less than ten percent or more than twenty percent. Act of April 23, 1999, 76th Leg., R.S., ch. 62, §§ 7.18(a), 1999 Tex. Gen. Laws 127, 232. On September 1, 2003, the post-judgment interest rate became the prime rate, but in no case less than five percent or more than fifteen percent. Tex. Fin.Code Ann. §§ 304.003(c) (Vernon Supp.2004). The 2003 statute provides, " "The changes in law made by this Act apply in a case in which a final judgment is signed or subject to appeal on or after the effective date of this Act." " Act of June 2, 2003, 78th Leg., R.S., ch. 676, §§ 2(a), 2003 Tex. Gen. Laws 2096, 2097.

Appellant asserts the 2003 amendment applies in this case. Appellant concedes the judgment in this case was signed before September 1, 2003, but appellant argues that because this case was pending on appeal in this Court on September 1, 2003, it was " "subject to appeal on or after the effective date of" " the 2003 amendments. Because pre-judgment interest in a wrongful death case is awarded at the same rate as post-judgment interest, appellant asks that we modify both the pre-judgment and

the post-judgment interest rates by applying the 2003 amendment. *See* Tex. Fin. Code Ann. §§ 304.103 (Vernon Supp.2004).

The Fort Worth Court of Appeals faced this argument in *Columbia Medical Center v. Bush,* 122 S.W.3d 835, 864–66 (Tex.App.-Fort Worth 2003, pet. filed). There, the court of appeals examined the legislative history and observed that the Senate Committee's bill analysis states section 2(a) of the act " "Makes application of this Act prospective." " Senate Comm. on Jurisprudence, Bill Analysis, Tex. H.B. 2415, 78th Leg., R.S. (2003); *Columbia Med. Ctr.,* 122 S.W.3d at 866. The court of appeals interpreted section 2(a) of the amendment as providing that the amendment applied to (1) judgments signed on or after September 1, 2003, and (2) judgments signed before September 1, 2003 but which did not become subject to appeal until on or after September 1, 2003, such as a default judgment in a multi-defendant case where the default judgment, although signed before September 1, 2003, was not appealable until the plaintiff's claims against the remaining defendants were disposed of after September 1, 2003. *Columbia Med. Ctr.,* 122 S.W.3d at 865–66.

We agree with the court of appeals' interpretation of the amendment. *CIGNA Healthcare of Texas, Inc. v. Pybas,* 127 S.W.3d 400, 420–21 (Tex.App.-Dallas 2004, no pet. h.)(same holding). Because the judgment in this case was both signed and subject to appeal before September 1, 2003, the amended statute setting post-judgment interest rates does not apply. *Id.* at 421. Accordingly, we conclude appellant's argument lacks merit. We resolve this issue against appellant.

## Conclusion

Having overruled appellant's second through fourth issues, we reverse and render judgment on the first issue and con-

clude that damages obtained in the trial court are subject to the statutory cap contained in the MLIIA. *See,* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 11.02(a) (Vernon Supp.2003). The initial Final Judgment of the trial court dated August 30, 2002, before it removed the cap in its Amended Final Judgment on December 3, 2002, was the correct rendition. Therefore, we reverse the Amended Final Judgment in part, and render judgment that the calculations used in the August 30, 2002 judgment, were correct. In all other respects, we affirm the judgment of the trial court.